UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
———————————————————————X
                                                      :
SHAMAR VIERA,                                         :
                                                      :          **FIRST AMENDED**
                              Plaintiff,              :          **COMPLAINT_____**
                                                      :
              -against-                               :
                                                      :          (Jury Trial Demanded)
THE CITY OF NEW YORK; NYPD DETECTIVE                  :
JOHN MCDONALD; NYPD DETECTIVE                         :          24 CV 1272 (AMD)(MMH)
CHRISTOPHER OBDYKE; and NYPD POLICE                   :
OFFICER MIGUEL VARGAS,                                :
                                                      :
                              Defendants.             :
                                                      :
———————————————————————X

        SHAMAR VIERA, by his attorneys THE LAW FIRM OF ANDREW M. STENGEL,

P.C., complaining of the defendants, respectfully alleges, upon information and belief, as

follows:

## NATURE OF ACTION

        1.      This civil rights action under 42 U.S.C. §§ 1983 and 1988, and New York law,

arises from the wrongful arrest, prosecution, and conviction of Shamar Viera, who spent nearly

11 years in prison due to police and prosecutorial misconduct.

        2.      This lawsuit seeks to hold the individual defendants liable for manufacturing

evidence against him, coercing witnesses into falsely incriminating him, and suppressing

exculpatory evidence.

        3.      This lawsuit also seeks to hold the City of New York liable as the individual

defendants' conduct was substantially caused by the Kings County District Attorney's and New

1

York City Police Department's training, policies, customs, and practices evincing deliberate indifference to the constitutional rights of criminal defendants investigated, arrested, and prosecuted by those offices.

## JURISDICTION, VENUE & CONDITIONS PRECEDENT

4.     This action arises under 42 U.S.C. §§ 1983 and 1988, and the common law of the State of New York.

5.     Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343, and by principles of pendent jurisdiction.

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

7.     On or about April 12, 2023, Viera filed a timely General Municipal Law § 50-e notice of claim with the City of New York.

8.     More than 90 days have elapsed since Viera filed his notice of claim without settlement by the City.

## THE PARTIES

9.     Plaintiff Shamar Viera ("Viera") is a resident of the State of New York.

10.     Defendant, City of New York ("City"), of which the County of Kings is a political subdivision, is a municipal corporation of the State of New York.  Both the Kings County District Attorney's Office and The New York City Police Department ("NYPD") are municipal agencies or offices of the City.

11.     Defendant, John McDonald ("McDonald"), at all relevant times, was a detective employed by the NYPD, and acted toward Viera under color of the statutes, ordinances, customs,

and usage of the State of New York, and acted within the scope of his employment.  He is sued in his individual and official capacities.

12.     Defendant, Christoper Obdyke ("Obdyke"), at all relevant times, was a detective employed by the NYPD, and acted toward Viera under color of the statutes, ordinances, customs, and usage of the State of New York, and acted within the scope of his employment.  He is sued in his individual and official capacities.

13.     Defendant, Police Officer Miguel Vargas ("Vargas"), at all relevant times, was an NYPD police officer and acted toward Viera under color of the statutes, ordinances, customs, and usage of the State of New York, and acted within the scope of his employment.  He is sued in his individual and official capacities.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

**A.    The Crime: Kenneth Williams, A Local Drug Delivery Man, Is Shot On
The Roof Of A Housing Project Building In East New York, Brooklyn**

14.     Kenneth Williams was a local drug courier known in his neighborhood as "Running Man."

15.     Williams was also a crack-cocaine addict.

16.     Williams worked daily out of a corner store in Coney Island, Brooklyn, that sold illegal tobacco products and other goods.

17.     In addition to stocking merchandise and cleaning up in the store, Williams would hold and deliver drugs for local dealers, and let them know when police were in the neighborhood.

3

18.     On January 17, 2011, around 5:00 p.m., Kenneth Williams entered 829 Schenck Avenue, part of the Boulevard Housing Project in East New York, Brooklyn.  At the time, Williams was with a man named James Farmer and one or possibly two other men.

19.     Williams had connections to that particular housing project: his cousin lived nearby and one of Williams' childhood friends, Shakina Gadson, who grew up with Williams in Coney Island, lived in a housing project building adjacent to 829 Schenck Avenue.

20.     The men went to the roof of the building and there, Williams was shot approximately three times in the chest, abdomen, and thigh by either Farmer and/or one of the men who accompanied them.

21.     Police Officers Adam Triolo and Miguel Vargas, who were on the street nearby, heard the gunshots and tried to determine where they came from.

22.     They headed in the direction where the sound of gunfire came from and saw Williams flagging them down before he collapsed in front of 829 Schenck Avenue.  Williams' injuries were critical and he was at risk of dying.

23.     Williams was screaming in pain and asking the officers if he was going to die. Officer Triolo, seeing the extent of Williams' injuries, answered Williams affirmatively, telling him he was in fact going to die.

24.     In those crucial moments, Officer Triolo asked Williams to identify the person who shot him.

25.     Williams responded by telling Triolo and Vargas the nicknames of two men who shot him after taking him to a liquor store: "Poppy," whose real name was Damien James, and "Jamar," who was James Farmer.

4

26.     Williams' dying declaration identifying his shooters was memorialized in a contemporaneous NYPD Unusual Occurrence Report stating "[v]ictim … states he knows the perpetrators from Coney Island and gave the nicknames of two of the three perpetrators, "Jamar" and "Poppy[.]"

27.     Minutes after Williams made his first dying declaration, he made a second one to Triolo and Detective Anthony Amorese, who had by then responded to the scene.  As Williams was being placed into an ambulance that responded to the scene, he told Triolo and Detective Amorese that "Poppy" and "Jamal" shot him and that they were from Coney Island.

28.     This second dying declaration was memorialized in a DA Homicide Investigative Report prepared just two days after the shooting.

29.     Critically, Viera was neither "Poppy," "Jamar," or "Jamal," and had never been known by or used those aliases or names.

30.     The ambulance transported Williams to Brookdale Hospital in critical condition, where he lapsed into a coma.

31.     Police immediately suspected Williams was shot because he was scheduled to testify as a witness in an upcoming homicide trial.

32.     Two years prior to Williams' shooting, he became a witness for the DA's Office in the murder prosecution of *People v. Terell Viera*.   Terell —Plaintiff Shamar Viera's brother— was on Rikers Island awaiting trial for shooting a man in Coney Island, and he was scheduled to begin trial the day following Williams' shooting.  Williams' status as a witness in Terell's case had recently been revealed during a pretrial hearing in Terell's case.

33.     Working off the premise that Williams had been targeted, the DA's Office focused on Damien James and James Farmer.   Police would later learn that Terell had written to Farmer after learning that Williams would be a witness in the homicide case.

34.     Police contacted the New York State Division of Parole and had James violated for attempting to murder Williams.  *See* Exhibit A, Damian James Violation of Release Report, Jan. 17, 2011 ("Damian James violated Rule No. 8 … in that on 1-17-11, at approximately 5:18 pm, on the roof of 817-829 Schenck Ave. Brooklyn, N.Y., he while attempting to cause the death of Kenneth Williams … caused him serious physical injury using a deadly weapon, to wit: a firearm.")

35.     Further, just three weeks after Williams was shot, Farmer was arrested in possession of the gun used to shoot Williams.

36.     Neither Viera nor his co-plaintiff Rodger Freeman's DNA was present on the weapon.

37.     When Farmer was arrested for the gun, he refused to cooperate with police, but police discovered that he was a close friend of Terell's.

38.     In fact, just one week before Williams was shot, Terell was recorded on a telephone call from Rikers stating he had sent Farmer a letter, and that Farmer should destroy it after reading it.

39.     At the time of Williams' shooting, the police and DA were conducting a long-term "Coney Island" investigation focusing on gangs and violent crime in Coney Island, Brooklyn.

40.     Both James and Farmer were involved in that activity, and upon information and belief, were cooperating witnesses and/or informants for the police, DA's office, and/or federal government whose arrests stood to undermine other cases under investigation.[1]

41.     On January 18, 2011, Detective Obdyke reviewed Terell's Rikers Island visiting records and learned that about a week before Williams was shot, co-plaintiff Freeman and a woman named Kiera Adams visited Terell on Rikers Island.  Despite the evidence pointing to James and Farmer, Obdyke began to focus the Williams investigation on Freeman, and subsequently, Viera.

**B.     The Police Fabricate Evidence To Build A Case Against Viera**

42.     On January 19, 2011, Freeman was arrested for the alleged possession of a handgun police recovered from a cab he was a passenger in.  The gun was unrelated to the Williams shooting.

43.     After being arrested, police confiscated Freeman's cellphone.

44.     Freeman's cellphone was locked, password protected, and not accessible to anyone other than Freeman.

45.     On January 20, 2011, Detective John McDonald arrived to the precinct where Freeman was being held and conducted or caused to be conducted a warrantless search of Freeman's cellphone.

---

[1]On January 18, 2012, the DA's Office issued a subpoena in Farmer's case, *People v. James Farmer,* Kings Co. Ind. No. 2406/2011, to the N.Y.C. Department of Corrections for production of Terell's Rikers Island commissary records.  Exhibit B

46.     McDonald's search, using a device called Cellebrite, produced a report of Freeman's contacts, text messages, SMS messages, videos, photographs, historical cell cite data, and other information in readable format.

47.     McDonald's search was conducted without a warrant, probable cause, exception to the warrant requirement, or any legal justification.  The illegal search resulted in virtually all of the contents of Freeman's phone being downloaded and stored for McDonald's use.

48.     The results of McDonald's search of Freeman's cellphone were itemized in January 20, 2011, entries in McDonald's memo book, including the phone numbers and historical cell site location information obtained from Freeman's cellphone.  Exhibit C.[2]

49.     After unlawfully searching Freeman's cellphone, McDonald then took affirmative steps to cover up his actions.

50.     First, McDonald suppressed from the Kings County District Attorney's Office ("the DA's Office") his memo book entry showing the date of his search of Freeman's telephone and the information he learned from the search.

51.     Second, during pretrial meetings with the DA's Office, including those with Assistant District Attorney Melissa L. Carvajal who assisted in drafting a search warrant for Freeman's cellphone —and who would later prosecute Viera, Freeman, and Terell— McDonald suppressed the fact that he had already searched Freeman's phone, and that any subsequent search of the phone was illegal under the Fourth Amendment to the U.S. Constitution and New York law.

---

[2]A search warrant would not be issued for Freeman's cellphone until January 21, 2011, and the warrant would not be executed until March 22, 2011.

52.     McDonald also misled the DA's Office to believe that probable cause existed for issuance of the search warrant.

53.     Specifically, on January 21, 2011, McDonald, prompted by information gleaned directly from his search of Freeman's cellphone, applied for a warrant to search the cellphone.  In McDonald's sworn affidavit in support of the warrant, he (a) omitted the fact that he had already illegally searched Freeman's cellphone and retrieved its contents, which would have led the judge to deny the search warrant, and (2) falsely claimed Freeman was arrested with a gun near the home of another witness in Terell's homicide case.

54.     In truth, Freeman was not arrested in possession of the gun (it was in the cab he was in) and Freeman was not near the home of any witness.  Indeed, the DA's Office had not revealed the existence of any other witness in Terell's homicide case, and the only incriminating witness the DA's Office would present at Terell's trial was Williams.

55.     The DA's Office, unaware of McDonald's deception, supported McDonald's application for the warrant.

56.     Judge Neil Firetog, also unaware of McDonald's misconduct, granted the requested warrant on January 21, 2011.

57.     The warrant was then used to deceive Viera, his attorney, the DA's Office, and Judge Firedog that the contents of Freeman's cellphone had been lawfully obtained, to convince the DA's Office of the strength of the case against Viera, and that Viera and Freeman should be prosecuted.

58.     As a result of the cellphone search and cellphone data placing Viera and Freeman, at the relevant time, within a two-mile radius of the location where Williams was shot, the police made Viera and Freeman the targets of their investigation.

59.     However, with the case against Viera and Freeman undermined by Williams' dying declarations and Farmer being arrested with the gun used to shoot Williams, police scrambled to shore up their case against Viera and Freeman.

60.     First, although Williams' declarations named "Poppy," and "Jamal" or "Jamar" as the shooters, Officer Vargas lied to the DA's Office that Williams had actually identified "Shamar" Viera as the shooter.

61.     Vargas also lied to the DA's Office that Williams had never mentioned the name "Poppy."

62.     Obdyke lied to the DA's Office as well, informing the DA that while Williams was being transported to the hospital, he recanted or corrected his statement that "Jamar" was the shooter and said the shooter was actually "Shamar."

63.     Neither Vargas nor Obdyke recorded these critical statements in any contemporaneous police report, as mandated by NYPD policy requiring that all relevant statements and information be contemporaneously memorialized in a report.

64.     Moreover, both Vargas' and Obdyke's false statements corroborated a statement McDonald would fabricate implicating Viera, and made it more likely that the DA's Office would accept McDonald's statement as true and bring charges based on it.  In that regard, on February 7, 2011, McDonald fabricated photo identifications and a statement incriminating both Viera and Freeman.

65.     On that date, McDonald interviewed Williams at Brookdale Hospital.  At the time, Williams had *never* named Viera nor Freeman as being involved in his shooting, much less claimed they were the shooters.

66.     Nevertheless, McDonald created a police report indicating Williams identified Viera from a photo array as the one who shot him, and that Williams identified Freeman from a photo array as being on the roof with Viera at the time of the shooting.  (At trial Williams was unable to identify Freeman.)

67.     McDonald also created a false police report, DD5 Complaint Follow-up #36, incriminating Viera and Freeman.  The report indicated Williams told McDonald Freeman picked him up in Coney Island, accompanied him into a liquor store, drove him from Coney Island to East New York along with Viera and Damian James, and that Freeman was on the roof with Viera when Viera shot Williams.

68.     McDonald went out of his way in the report to tie Williams' shooting to his status as a witness, claiming Williams said that Viera yelled out, "that's for my brother" as he shot Williams.

69.     The report was false.  Williams never made those statements to McDonald (¶¶ 66-67).

70.     After fabricating Williams' identifications and statements incriminating Viera and Freeman, McDonald forwarded his false report to the DA's Office.

71.     McDonald also met with prosecutors, orally conveyed to them the false information contained in his report and affidavit in support of the search warrant, and continued to mislead them that the data from Freeman's cellphone was legally obtained.

72.     After McDonald created his false February 7, 2011, report, Obdyke created a false report to corroborate it.  Specifically, on February 9, 2011, Obdyke created a police report claiming *that three weeks earlier*, on January 17, 2011, Williams recanted or corrected his statement that "Jamar" was the shooter and said the shooter was actually "Shamar."

73.     Likewise, Obdyke and Vargas met with prosecutors and orally conveyed to them that Williams' recanted (¶¶ 60-63).

74.     While urging prosecutors to charge Viera and Freeman based on the evidence developed during the police investigation, McDonald, Obdyke, and Vargas failed to reveal to the DA's Office numerous items of exculpatory and/or impeaching information, including:

    (a)     McDonald unlawfully searched Freeman's cellphone and downloaded the information on it;

    (b)     McDonald's affidavit in support of his search warrant (1) omitted the fact that he had already, illegally searched Freeman's cellphone and retrieved its contents, and (2) falsely claimed Freeman was arrested with a gun near the home of another witness in the homicide case;

    (c)     McDonald's memo book entry showing he had illegally searched Freeman's cellphone;

    (d)     McDonald fabricated Williams' photo identifications of Viera and Freeman;

    (e)     McDonald fabricated Williams' statement incriminating Viera and Freeman;

    (f)     Vargas and Obdyke fabricated Williams' statement identifying Viera; and

    (g)     McDonald's and Obdyke's fabricated police reports.

74.     Based in large part on this false evidence and suppression of exculpatory material, the DA's Office decided to bring charges against Viera and Freeman.

C.    **Viera Is Indicted Following A Misleading Grand Jury Presentation**

75.    In March 2011, the DA's Office presented the Williams shooting to a confidential grand jury.

76.    Williams, Obdyke, and Detective McDonald testified at the grand jury.

77.    The prosecutor presenting the case to the grand jury did not inform the grand jury of the exculpatory and impeaching information identified in ¶ 73, above.

78.    On or about March 31, 2011, under Kings County Indictment No. 2406/2011, Viera was indicted with Freeman and Terell for attempted murder and related charges.

79.    Freeman, who was in federal custody defending against the gun charge, was later transferred to Rikers Island and held without bail.

80.    Likewise, following Viera's arrest, he was incarcerated without bail on Rikers.

D.    **The District Attorney's Misconduct Prior To Trial**

1.    **The Prosecutor Perpetuates McDonald's Perjury**

81.    By November 2011, ADA Carvajal had obtained McDonald's memo book and discovered his illegal search of Freeman's cellphone and the falsity of his search warrant affidavit.

82.    Nevertheless, rather than disclose that memo book entry, the illegal search of Freeman's cellphone, and the falsity of the search warrant affidavit, Carvajal defended the search, falsely swore it was lawful, and falsely swore Detective McDonald's affidavit was truthful.  In an affirmation opposing Freeman's motion to controvert the search of his cellphone, Carvajal asserted:

On January 21, 2011 Detective John McDonald, appeared before Honorable Neil Jon Firetog and applied for the issuance of a warrant based upon information contained in an affidavit.

On January 21, 2011 Judge Firetog issued a warrant authorizing the search of the above-mentioned phone.

The search warrant was executed and the information that was recovered from the above-mentioned phone was given to the defense attorney as part of routine discovery.

The defendant relies in his moving papers, in sum, that the search warrant was issued without probable cause and that the People's affidavit contained materially false statements.

The People contend that the defendant was arrested lawfully on January 19, 2011 … and that a valid search warrant based on probable cause was executed on his cellular telephone.

83.     During an ensuing court inquiry, Carvajal led Detective McDonald to swear under oath that he had *not* searched Freeman's cellphone prior to obtaining a search warrant.

84.     Further, during that inquiry, Carvajal sat by silently as McDonald falsely responded to Judge Neil Firetog's question about whether McDonald conducted a warrantless search of Freeman's cellphone.

85.     During that inquiry, Carvajal continued to withhold McDonald's memo book entry, the falsity of McDonald's factual representations and search warrant affidavit, and the falsity of her own opposition to Freeman's motion to controvert the search warrant.

86.     Based on Carvajal's opposition and McDonald's representations to the court, Judge Firetog denied Freeman's motion, and denied a full hearing to controvert the search warrant.

### 2.    The Prosecutor Coaches Williams To Provide False Testimony

87.    After Viera was indicted, Carvajal began the process of preparing Williams for trial.  Assisting throughout the process was McDonald, who by then had replaced Obdyke as the lead detective on the case.

88.    In accordance with DA policy, Carvajal and/or McDonald interviewed Williams several times in connection with the case.  Carvajal and/or McDonald began to feed Williams facts and shape his account of the crime to both help Carvajal prove her case and tie Williams' shooting to his status as a witness.

89.    Prior to these sessions, Williams had never legitimately identified Viera or Freeman.  However, during pretrial meetings with Williams, Carvajal and/or McDonald led Williams to (a) identify Freeman as the shooter and claim after Viera shot him, he threw the gun to Freeman who shot Williams as well, and (b) claim that when Viera shot him, Viera yelled out, "You snitch motherfucker," and "Hardbody."

90.    Williams would go on to parrot that false testimony at Viera's and Freeman's joint trial.

### 3.    The Prosecutor Secretly Coerces Nicole Williams
### Into Providing Evidence Against Freeman

91.    Following the Police and DA's Office's review of Freeman's cellphone records, they learned that Freeman's girlfriend lived in the same building where Williams was shot, and that Freeman allegedly called his girlfriend's home several times on the day of the shooting.

92.    As a result, the prosecutor coerced Nicole Williams, the mother of Freeman's girlfriend, into providing incriminating evidence against Freeman —which bolstered the

prosecution's case against Viera— claiming he entered her apartment before the shooting and then left carrying a black bag. In truth, Ms. Williams was not even home when the shooting took place.

93.     First, Carvajal abused process by using illegal "office subpoenas" to coerce Ms. Williams —who had never spoken to police or incriminated Viera or Freeman—to appear at the DA's Office and meet with Carvajal so Ms. Williams could be pressured into testifying against Freeman.

94.     The office subpoenas, colloquially referred to as "Come See Me Letters," consist of a grand jury subpoena and letter to the witness requesting the witness' appearance at the DA's Office.

95.     The office subpoenas are designed to "coerce" witnesses into meeting with prosecutors, *People v. Neptune*, 161 Misc.2d 781, 782-783 (Sup. Ct. Kings Co. 1994) (Gerges, J.), and have long ago been declared illegal. *Id.*; *Rodrigues v. City of New York*, 193 A.D.2d 79, 86 (1st Dep't 1993) (prosecutor may not use a subpoena to force witness to appear at his office); *Matter of Rain*, 162 A.D.3d 1458, 1459 (3d Dep't 2018) (prosecutor's use of office subpoenas constituted fraudulent conduct and, along with other misconduct, warranted two-year suspension).

96.     During one or more of those meetings, Carvajal threatened Ms. Williams that if she did not cooperate, she and/or her son Dwon Williams would be arrested.

97.     Based on this conduct, Ms. Williams agreed to testify against Freeman.

**E.**   **The District Attorney's Misconduct During Trial**

98.     Carvajal was required, under the U.S. Constitution and the laws of the United States and of the State of New York, to disclose to the defense all evidence and information known to the DA's Office or to the NYPD that was favorable to the defense and, considered cumulatively, was reasonably likely to affect the outcome of the trial ("*Brady*" material).

99.     Where such information had been specifically requested by the defense,  Carvajal was required under federal and New York law to disclose it if there was any reasonable possibility that it might affect the trial's outcome.

100.     This included information tending to impeach the credibility of significant witnesses called by the prosecution to meet its burden of convincing every member of the jury, beyond a reasonable doubt, that the defendant was guilty.

101.     Such information was required to be disclosed in a timely manner, meaning sufficiently in advance of trial to permit the defense to adequately investigate and make use of it.

102.     Such information had to be disclosed whether it was recorded or just verbal.

103.     In addition, Carvajal had a federal constitutional obligation not to introduce testimony or evidence, or to make argument, that she knew, or should have known, was false or misleading, and to promptly correct any false or misleading evidence or argument that the prosecution presented to the court or to the jury.

104.     Finally, Carvajal had an absolute obligation under New York law, at the beginning of the trial, to disclose to the defense all recorded statements of prosecution witnesses (known as "*Rosario*" material) relevant to the subject matter of their direct testimony.

105.    Where *Rosario* material was favorable to the defense and material, it was also required to be disclosed under *Brady*.

106.    By law, the defense was legally entitled to rely on the completeness of Carvajal's *Brady* and *Rosario* disclosures.

107.    By law, the defense was not required to assume Carvajal, as an officer of the court, made an incomplete, false, and/or misleading disclosure.

108.    Moreover, Viera's reliance on the correctness of Carvajal's factual representations was particularly important as Carvajal had obtained an *ex parte* protective order permitting her to withhold, until the morning Ms. Williams took the stand, the fact that Ms. Williams would be testifying.  In other words, Viera and his defense attorney were completely reliant on the accuracy and completeness of the information Carvajal provided to them.

109.    Rather than comply with her constitutional, statutory and ethical obligations, Carvajal systematically misled the court, jury, and defense concerning the circumstances under which Williams and Ms. Williams were testifying, introduced testimony and arguments she knew, or should have known, were false or misleading, and withheld *Brady* and *Rosario* material she knew or should have known, was required to be disclosed.

110.    At trial the primary evidence against Viera was provided by Williams and Ms. Williams.[3]

---

[3] The only other evidence was inconclusive cellphone tower data.

1. <u>**Williams**</u>

111.    At trial Carvajal represented that Williams was purely a victim with no reason for

testifying.  However, Carvajal withheld that the DA's Office had relocated Williams' fiancé and

paid thousands of dollars toward her housing costs.

112.    Additionally, Carvajal withheld a host of records that the DA's Witness Protection

Program required to be prepared in connection with all witness relocations, including a

memorandum from ADA Carvajal regarding the assistance she requested for Williams and his

fiancé, and written agreements between the DA's Office and Williams and his fiancé itemizing

the assistance the DA's Office would provide.

113.    ADA Carvajal also failed to disclose that Williams was a crack-cocaine addict,

and in all likelihood, still on drugs at the time he was relocated.

114.    Carvajal likewise failed to disclose the recording and transcript of

Williams' "riding" interview.

115.    The DA's "Riding Program" required all witnesses in felony cases to be

interviewed under oath and tape-recorded by the DA's Office in order to lock in their testimony

for trial.  Exhibit D (DA Riding Policy Memorandum).

116.    The recording and transcript of Williams' riding interview was classic *Rosario*

material and *Brady* material as well, as Williams' riding statement either (a) parroted or

harmonized with the prior false facts McDonald fed to him (and was thus evidence of

McDonald's misconduct), and/or (2) was inconsistent with Williams' prior statement

incriminating Freeman and Viera.

117.     Finally, despite the secret benefits Williams received, Carvajal argued in

summation that Williams did not have any undisclosed motive for testifying:

> But, when you listen to his testimony, I submit to you he's trying to
> be as accurate as possible as he can and that Kenneth Williams
> certainly has no motive to lie to you ….. I submit to you that
> Kenneth Williams has absolutely no motive to lie here. He is the
> victim. He is the one that was injured. What axe to grind would he
> have against people that didn't do this to him?

### 2.     Ms. Williams

118.     Carvajal never disclosed her use of office subpoenas to interview Ms. Williams, a

clear *Brady* violation as the use of those office subpoenas provided Viera with grounds to

suppress  "any information" obtained from Ms. Williams, *People v. Arocho*, 85 Misc.2d 116

(Sup. Ct. New York Co. 1976), *Milke v. Ryan*, 711 F.3d 998, 1019 (9th Cir. 2013), and to

impeach the integrity of the prosecution's case, *Kyles v. Whitley*, 514 U.S. 419 (1995).

119.     Carvajal also failed to disclose secret benefits she provided to Ms. Williams to

induce her testimony.  ADA Carvajal assisted Ms. Williams by (a) resolving several Medicaid

issues, and (b) finding an apartment and resolving an issue she was having with the New York

City Housing Authority.

120.     ADA Carvajal also failed to disclose other impeaching information regarding Ms.

Williams, including (a) Ms. Williams had previously been arrested for making a willful

misrepresentation of material fact to Immigration Authorities and being in the country illegally,

(b)  Ms. Williams had initiated several Domestic Incident Reports in the past (and possibly

received a U-Visa sponsored by the DA's Office), and (c) Williams previously testified for the

DA's Office as a witness against her uncle.

121.    While suppressing this information, ADA Carvajal gave a summation falsely

claiming Ms. Williams had no undisclosed incentive to testify:

> And you have testimony from a lot of witnesses. The first one I
> want to speak to you about is Nicole Williams, okay?  Now, Nicole
> Williams, what motive does she have to lie? To come in here?
>
> You know, the judge is going to give you a charge on credibility
> and how to assess if somebody's being truthful and accurate, you
> can rely on them or if they have a motive to lie to you or if they're
> just mistaken and you're going to decide that.  What does Nicole
> Williams tell you, ladies and gentlemen?

### 3.    The Prosecutor's False Summation Regarding Damian James

122.    Carvajal argued during summation that Williams' dying declaration that Damian

James was the shooter was simply a mistake, that police had determined James was not at the

crime scene, and that James had never been arrested for the crime:

> The detectives spoke to him, got his story and then confirmed that
> he was in Coney Island, that he wasn't there.  So, we know that
> Kenneth Williams got that wrong. And that's why Damian James
> isn't sitting there. The evidence is he was never arrested.  That's
> what the evidence is before you.

123.    Carvajal's argument was false.  As Carvajal well knew, the New York State

Division of Parole arrested and charged James with violating his parole for shooting Williams.

124.    As previously stated, James' parole was revoked because he shot Williams (¶ 34,

above).

### 4.    The Informant/Cooperative Witness Records Regarding Farmer and James

125.    Carvajal failed to disclose Farmer and/or James related records maintained by the

DA's Office pursuant to DA Investigators' Directive Revised No. 28 ("Guidelines concerning the

use of confidential informants and cooperative witnesses"), attached as Exhibit N, and other records, that would have supported a defense theory that prosecutors shielded James and Farmer from criminal liability for Williams' attempted murder because they were cooperating witnesses in other investigations and/or cases.

126.    The jury convicted Viera of attempted murder, conspiracy, intimidating a victim or a witness, and criminal possession of a weapon.

127.    On May 19, 2014, he was sentenced to 40 years to life in prison.

**F.      Viera's Conviction Is Overturned And His Charges Dismissed**

128.    Four years later, in 2018, the New York Appellate Division reversed Viera's conviction based on a jury selection issue and granted him a new trial.

129.    Viera was remanded to Rikers Island and once again denied bail.

130.    As Viera awaited retrial, New York passed sweeping discovery reforms requiring the DA's Office to make broad disclosures and, before answering ready for trial, to file a certificate of discovery compliance that would require the newly assigned prosecutor to disclose, among other things, the suppressed *Brady* material, and false evidence used during Viera's trial.

131.    Rather than make those required disclosures, the DA's Office sought adjournment after adjournment of Viera's case, causing him to remain on Rikers Island for an additional three years.

132.    When Viera and Freeman moved to dismiss their cases on speedy trial grounds, the DA's Office *consented* to the motions.

133.    On January 17, 2023, the Court dismissed all charges against Viera and Freeman, and they were both finally released from custody.

134.    By then, Viera lost nearly 11 years of his life due to this wrongful incarceration.

**G.    Viera's Damages**

135.    Viera's injuries and damages include, but are not limited to:

(a)    His false and malicious arrest, prosecution, and conviction and sentence of 40 years in prison;

(b)    His nearly 11-year loss of his liberty;

(c)    Past and future physical illnesses and injuries resulting from his wrongful conviction;

(d)    Past and future mental and emotional injuries and suffering; and

(e)    The loss of the services, society, companionship, and consortium of his children, fiancée, grandmother, brothers and sister, and other family members and friends.

**FIRST CAUSE OF ACTION**
(Malicious Prosecution and Deprivation of Liberty Under the Fourth, Fifth, Sixth, and Fourteenth Amendments; 42 U.S. C. § 1983; All Defendants)

136.    Viera realleges the allegations contained in ¶¶ 1-135 of this Complaint, and incorporates them here and in all following paragraphs.

137.    McDonald, Obdyke, and Vargas, individually, collectively, acting in concert and aiding and abetting one another, intentionally, knowingly, and willfully manufactured, or caused the manufacturing of, false statements and identifications by Williams incriminating Viera in the crime.

138.    McDonald, Obdyke, and Vargas knew that Williams' statements and identifications would be relied on by the DA's Office and the court as a basis to authorize Viera's arrest, and to formally initiate his prosecution, and that the statements and identifications would

be introduced at Viera's trial.   Williams' statement and identifications were in fact introduced at Viera's trial.

139.     By virtue of the foregoing, McDonald, Obdyke, and Vargas, with actual malice, initiated, continued, or caused the initiation and continuation of, criminal proceedings against Viera that they knew, or should have known, there was no probable cause for and for which in fact there was no probable cause, and thereby caused Viera to be deprived of his liberty.

140.     Those proceedings were ultimately terminated in Viera's favor.  *See* Exhibit E (Certificate of Disposition in *People v. Shamar Viera*, Kings Co, Ind. No. 2406/2011).

141.     McDonald, Obdyke, and Vargas knew, but withheld from the DA's Office, either permanently or for a substantial period of time, and therefore from the court and the defense, exculpatory or impeaching evidence that tended to negate Viera's guilt and which they knew or should have known the law required them to timely disclose.  This evidence included, but was not limited to, the items detailed in ¶ 73, 81-90, above.

142.     The aforesaid conduct, which McDonald, Obdyke, and Vargas committed individually, collectively, in concert with and in aid of each other, and/or in concert or conspiracy with other named and unnamed individuals, operated to deprive Viera of his rights under the Constitution and the Laws of the United States:

> (a)     Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based on false, fabricated, manufactured, misleading, or inherently unreliable "evidence," including the statements and testimony of witnesses who have been improperly influenced, coerced, or manipulated to provide such statements and testimony, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution;

> (b)     Not to be deprived of his liberty absent probable cause to believe he has committed a crime, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and
>
> (c)     To timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

143.    The foregoing violations of Viera's federal constitutional rights by McDonald, Obdyke, and Vargas directly, substantially, proximately, and foreseeably caused the initiation and continuation of Viera's criminal prosecution, his loss of liberty, his wrongful conviction, his subsequent imprisonment, and his other injuries and damages.

144.    The foregoing violations of Viera's rights amounted to Constitutional torts and were affected by actions taken under the color of State law, and within the scope of McDonald's, Obdyke's, and Vargas' employment and authority.

145.    McDonald, Obdyke, and Vargas committed the foregoing violations of Viera's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to his constitutional rights or to the effect of such misconduct on his constitutional rights.

146.    By reason of the foregoing, McDonald, Obdyke, and Vargas are liable to Viera for compensatory and punitive damages (¶ 135, above).

147.    The City is liable for this tort by virtue of Hynes' and the NYPD's policies, customs, and deliberate indifference to their employees' commission of such misconduct. *See* ¶¶ 167-322, *infra* (*Monell* claims against the City).

**SECOND CAUSE OF ACTION**
(Evidence Manufacturing; Denial of A Fair Trial Under The Fifth,
Sixth, and Fourteenth Amendments; 42 U.S. C. § 1983;  All
Defendants)

148.    Viera realleges the allegations contained in ¶¶ 1-147 of this Complaint, and

incorporates them here and in all following paragraphs.

149.    McDonald, Obdyke, and Vargas, individually, collectively, and acting in concert

and aiding and abetting the others, intentionally, recklessly, and with deliberate indifference to

Viera's constitutional rights, manufactured false evidence against him.

150.    Specifically, sometime between January 17, 2011, and April 2011, Obdyke and

Vargas manufactured a false statement from Williams claiming Viera was the shooter (¶¶ 60-63).

151.    From January 2011 through November 2011, McDonald repeatedly fabricated

evidence, including by way of McDonald's affidavit in support of the search warrant, that the

search of Freeman's cellphone had been lawful, and that it was not searched without a warrant.

152.    On February 7, 2011, McDonald fabricated photo identifications and a statement

from Williams incriminating both Viera and Freeman.

153.    The above manufactured evidence was likely to influence the jury's decision.

Moreover, the above manufactured evidence critically influenced the DA's decision to charge

Viera, the Court's decision to deny Viera bail, and both the DA's and the Court's assessment of

the strength of the case against Viera.

154.    McDonald's, Obdyke's, and Vargas' actions, collectively and individually,

deprived Viera of his right to not be prosecuted on fabricated evidence, and to a fair trial under

the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution, and were the proximate

cause of his injuries (¶ 135, above).

155.     By reason of the foregoing, McDonald, Obdyke, and Vargas are liable to Viera

for compensatory and punitive damages.

156.     The City is liable for these wrongs by virtue of Hynes' and the NYPD's policies,

customs, and deliberate indifference to, and failure to train, supervise, and discipline their

employees regarding such conduct, despite the likelihood that the failure to do so would result in

the injuries pled here.  *See* ¶¶ 167-322, *infra* (*Monell* claims against the City).

### THIRD CAUSE OF ACTION
(Suppression of *Brady v. Maryland*, 373 U.S. 83 (1963) and Denial Of
A Fair Trial Under The Fifth, Sixth, and Fourteenth Amendments; All
Defendants)

157.     Viera realleges the allegations contained in ¶¶ 1-156 of this Complaint, and

incorporates them here and in all following paragraphs.

158.     McDonald, Obdyke, and Vargas, individually, collectively, acting in concert,

aiding and abetting, and conspiring with each other, intentionally, recklessly, and with deliberate

indifference to Viera's constitutional rights, suppressed from the DA's Office and Viera (a) the

exculpatory and impeaching information detailed in ¶¶ 73, 81-90, above, (b) their creation of

false police reports and the false affidavit, (c) their false representations to the DA's Office to

convince the office to criminally charge Viera, and (d) their own and each other's misconduct.

159.     As a result of those defendants' suppression, Carvajal was unable to disclose the

exculpatory information detailed in the preceding paragraphs and to correct the false testimony

and argument that flowed from the suppression of that evidence.

160.    The suppressed evidence was material, likely to influence a jury's decision, and there is a reasonable probability that had the evidence been disclosed to the defense, the result of Viera's trial would have been different.

161.    McDonald, Obdyke, and Vargas' actions deprived Viera of his right:

(a)    Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based on false, fabricated, manufactured, misleading, or inherently unreliable "evidence," including the statements and testimony of witnesses who have been improperly influenced, coerced, or manipulated to provide such statements and testimony, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution;

(b)    Not to be deprived of his liberty absent probable cause to believe he has committed a crime in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

(c)    To timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

162.    The foregoing violations of Viera's federal constitutional rights by McDonald, Obdyke, and Vargas and their co-conspirators and accomplices, known and unknown, directly, substantially, proximately, and foreseeably caused the initiation and continuation of Viera's criminal prosecution, loss of liberty, detention without bail, wrongful conviction, subsequent imprisonment, and other injuries and damages.

163.    The foregoing violations of Viera's rights amount to constitutional torts and were affected by actions taken under the color of State law, and within the scope of McDonald, Obdyke, and Vargas' employment and authority.

164.    McDonald, Obdyke, and Vargas committed the foregoing violations of Viera's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Viera's constitutional rights or to the effect of such misconduct on those rights.

165.    By reason of the foregoing, McDonald, Obdyke, and Vargas are liable to Viera for the damages detailed in ¶ 135, above.

166.    The City is liable for these wrongs by virtue of Hynes' and the NYPD's policies, customs, and deliberate indifference to, and failure to train, supervise, and discipline their employees regarding such conduct, despite the likelihood that the failure to do so would result in the injuries pled here.  *See* ¶¶ 167-322, *infra* (*Monell* claims against the City).

### FOURTH CAUSE OF ACTION

(*Monell*/42 U.S.C. § 1983: Claim Against the City based on the
KCDA's unconstitutional training, policies, customs, and practices,
and failure to supervise, discipline, and rectify amounting to
deliberate indifference)

167.    Viera repeats the allegations in ¶¶ 1-166 above and incorporates them here and in all following paragraphs.

168.    Charles J. Hynes, the Kings County District Attorney from 1990 to 2013, who campaigned for office on a "get tough on crime" platform, took office on January 1, 1990, and throughout his tenure instituted a series of no-holds-barred, anything goes, scorched earth, training, and policies.

169.    Hynes' training and policies were aimed at winning convictions at any cost, including by suppressing exculpatory evidence and using false testimony, coercing witnesses to

provide testimony the office desired, irrespective of its truth or falsity, and disregarding any collateral damage inflicted in the process.

170. Hynes' attitude and approach metastasized throughout the office, from his executive staff to line prosecutors, and by his training, policies, and actions communicated to his staff that so long as they won convictions, he had their back, irrespective of the means they employed to secure those convictions.

171. Specifically, during the entirety of Hynes' administration, Hynes maintained affirmative or *de facto* office-wide, facially unconstitutional training, policies, customs, and practices that evinced deliberate indifference to the constitutional rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, of defendants who were investigated, arrested, or prosecuted by that office, including,

(a) Refraining from making any record of false or inconsistent out-of-court statements of prospective prosecution witnesses in order to avoid creating "*Rosario* material" that would have to be disclosed to the defense under State law, even though this policy also resulted in prosecutors ultimately not disclosing the same information as *Brady* material. Indeed, under the KCDAs "riding" program, prosecutors were permitted and encouraged to make a record of statements that tended to inculpate a suspect or defendant, while ignoring statements that were inconsistent with their belief about the suspect's or defendant's guilt, or the office's narrative of the case,

(b) The improper manipulation of witnesses and creation of false or inherently unreliable testimony, through physical and psychological coercion, threats, unlawful detentions, and promises of rewards,

(c) The toleration of police and detectives who used such practices, especially those handling homicide and other high-profile cases,

(d)     Withholding prosecution witnesses' pretrial recantations and other evidence if the prosecutors disbelieved, or at least claimed to disbelieve, the recantations, a blatant violation of *Brady* which requires any *objectively* favorable information to be disclosed to the defense,

(e)     The maintenance of an illegal "office-subpoena" practice, repeatedly condemned by New York courts, whereby subpoenas were used to coerce witnesses into meeting with prosecutors at the KCDA, and if the witnesses refused to appear, they would be brought to the KCDA against their will,

(f)     The maintenance of an illegal material witness warrant practice, whereby material witness warrants were obtained with false affirmations and, instead of bringing witnesses to court "forthwith" as required under New York law, material witness warrants were used to force witnesses to meet with prosecutors at the KCDA, and circumvent the witness' statutory right to counsel. Moreover, both the detective-investigators and the prosecutors who obtained the material witness warrant would affirmatively lie to the witness that the only choice the witness had was to go to jail or "agree" to be held in the KCDA's custody, when as a matter of law, the witness was entitled to an evidentiary hearing, had the possibility of being ordered released, and the court was mandated to grant the witness a reasonable bail if detention was ordered,

(g)     The maintenance of an illegal "Hotel Custody Program," in which the KCDA, with no legal authority to do so, imprisoned recalcitrant witnesses to coerce them into testifying, deprived them of their statutory right to counsel, and held them *incommunicado* in hotel rooms as prisoners, with their hotel doors shackled, guarded by detective-investigators, and without the ability to use a telephone or have visitors without the KCDA's permission,

(h)     The maintenance of an illegal "order to produce" practice, by which prosecutors would obtain court orders to unilaterally have inmates produced from jail or prison to the courthouse, purportedly to have them appear as witnesses when, in truth, the cases for which the inmates were produced were not being heard, the prosecutors' claims otherwise were false, and the attorney affirmations used to obtain the orders to produce were counterfeit ones which had been actually signed by a paralegal,

31

(i)      The abuse of *Damiani* orders to coerce defenseless inmates into testifying against criminal defendants by (1) submitting false affirmations to the court purporting to have been affirmed to and signed by prosecutors but which were actually signed by a Homicide Bureau paralegal (2) falsely representing in those "affirmations" that the target inmates asked to speak with the KCDA when, in truth, they had not and the prosecutors were unilaterally producing the inmates to the KCDA, (3) falsely representing to the court that the inmates would not be produced to the KCDA unless they consented, but then do nothing to honor that promise or ensure that the inmates consented to the production, and many times produce   those inmates without their consent or against their will, and (4) not disclosing any of these circumstances to the defendants the inmates testified against,

(j)      The secret practice of causing Corrections and State Division of Parole officials to revoke the release of former inmates to compel them to appear at the KCDA and to compel them to "cooperate,"

(k)      The withholding from criminal defendants favorable evidence under *Brady* and its progeny, including the KCDA's abuse of process to secure testimonial evidence, and

(l)      The knowing or reckless use of, reliance on, and failure to correct false, misleading, or inflammatory evidence and argument, including during summations.

172.    The existence, from 1990 to 2013, and for a time thereafter under the subsequent administration, of the training, policies, customs, and practices identified above in ¶ 171 (a), (c), (d), (e), (f), (g), (h), (i), and (j) is established by sworn *admissions* of former KCDA prosecutors,

KCDA records, and/or admissions by Hynes himself during his December 13, 2013, videotaped deposition in the Jabbar Collins case.[4]

173.    Moreover, much of the DA's training, in the form of the DA's In-House Continuing Legal Education ("CLE") courses, most of which were taught by office prosecutors, videotaped, and accompanied by written memoranda, establish the existence of the unconstitutional training, policies, customs, and practices identified above in ¶ 171 (a), (c), (d), (e), (f), (g), (h), (i), and (j) above.

174.    For example, a CLE in effect at the time of Viera's 2014 trial by the DA's Director of Legal Training, Catherine Dagonese, Case, *Witness & Trial Preparation Tips for New Prosecutors* (2014) (Exhibit F), establishes the DA's office-wide policy of maliciously abusing criminal process through the use of illegal office subpoenas —the very process used to coerce Ms. Williams in Viera's case.  *See* ¶¶ 92-97, above; *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994) (recognizing § 1983 action for malicious abuse of criminal process); *Rodrigues v. City of New York*, 193 A.D.2d at 86 (prosecutor may not use a subpoena to force witness to appear at his office).

_____

[4] *See e.g.* Deposition of Charles J. Hynes in *Collins v. City of New York* 11 CV 766 (FB) (RML), December 13, 2013 (admitting to Hotel Custody Program and practice of not taking notes); Deposition of Theresa Corrigan in *Zahery v. City of New York*, 98 CV 4546 (LTS) (admitting to pretrial witness recantation practice);  Hearing Testimony of Senior Homicide Prosecutor Stan Irvin during  CPL § 440.10 Hearing in *People v. Tasker Spruill*, Ind. No. 13008/95, July 1998, (admitting to *Damiani* practice); Deposition of KCDA Supervising Homicide Bureau Paralegal Liza Noonan Fitzpatrick in *Collins v. City of New York* 11 CV 766 (FB) (RML), May 10, 2013, pp. 53-56 (admitting to counterfeit affirmation and office subpoena practice); KCDA's Appellant's Brief in *People v. Tasker Spruill*, Kings Co. Ind. 13008/95, pp. 24, 26-27 (conceding that "[t]he practice in the [DA's] Office at the time was for the paralegal to sign the ADA's name on the paperwork."); Deposition of KCDA Detective-Investigator Christopher Salsarulo in *Quezada v. Brown*, 08 CV 5088 (KAM) (VVP) (E.D.N.Y.), January 19, 2012, pp. 40-41, 65-67 (admitting to abuse of material witness warrants); Deposition Transcript of Supervising Detective-Investigator Stephen Bondor in *Collins v. City of New York*, 11 CV 766 (FB) (RML), November 4, 2013, p. 50 (explaining the factual representations that would be made to material witnesses); Affirmation of Monique Ferrell in Opposition to Defendant's CPL§ 440.10 Motion in *People v. Collins*, Ind. No. 2884/94, Nov. 3, 2006, p. 41 (discussing the KCDA's "usual practice" of causing work release or parole to revoke the release of uncooperative former inmates); Exhibit D (Riding Memo).

175.    Despite the illegality of these office subpoenas, in the 2014 CLE the KCDA's *Director of Legal Training* provided a "Checklist" instructing line prosecutors that before announcing ready for trial, they should be prepared to discuss with their supervisors *whether they issued office subpoenas for their witnesses*.  Exhibit F at p. 4 ("Have you sent 'Come See Me Letters?").

176.    The CLE was an official written policy under *Monell*[5] and shows the use of these "fraudulent" office subpoenas was taught and authorized by the highest levels of the DA's Office.

177.    The unconstitutional training and policies identified above in ¶ 171 (b), (c), (e), (k), and (l), and ¶¶173-176 were followed by Carvajal and applied in Viera's case, and along with Carvajal's <u>intentional</u> suppression of *Brady* material[6] and knowing use of false evidence and argument (¶¶ 81-127, above), directly caused Viera's constitutional injuries.

178.    The unconstitutional policies identified above in ¶ 171 (k) and (l), and those of suppressing *Brady* material, knowingly using false or misleading evidence and argument, and improper and inflammatory summation, are established by:

(a)    Seventy-eight cases set forth in Exhibit G, finding prosecutors violated *Brady,* knowingly used false or misleading evidence, and made improper summation arguments,

(b)    Hynes' decision to reward most of the prosecutors who committed that misconduct rather than taking any steps to rectify it,

---

[5]*See e.g. Montero v. City of Yonkers, New York*, 890 F.3d 386, 403 (2d Cir. 2018) ("[O]fficial policy often refers to formal rules or customs that intentionally establish fixed plans of action over a period of time[.]") (Quotation marks omitted).  The DA's Office created Videotaped Self-Study CLEs on virtually all of the tactics employed by Carvajal in Viera's case.  *See e.g.* Riding: Taking Statements (Library Index No. 143); Riding Homicide Case (145); Riding: Basic Policies, Procedures, Paperwork & Policies (187); Talking to Police Officers: Preparing Witnesses for Testimony (201); Hostile & Uncooperative Witnesses, 5/12/99; Custody Relocation Training, 2/23/09.

[6]A "plaintiff is allowed to plead in the alternative."  *Breton v. City of New York*, 404 F.Supp.3d 799, 814 (S.D.N.Y., 2019) (Koeltl, J.), citing Federal Rule of Civil Procedure 8(d).

(c)    The maintenance of the office-wide practice of *deceiving* judges in criminal cases with false *Damiani*, material witness, and order to produce affirmations, and failing to disclose that deception to defendants, and

(d)    The maintenance of the office-wide practice of using office subpoenas, conduct that "constituted fraudulent conduct[.]"  *Matter of Rain*, 162 A.D.3d at 1459.

179.    Additionally, the DA's Office recently admitted that in the two decades preceding Viera's trial, the use of false evidence and suppression of *Brady* material were institutional failures of the Hynes administration, and resulted in at least 25 wrongful convictions.  *See* Kings County District Attorney's Office, *426 Years: An Examination of 25 Wrongful Convictions in Brooklyn*, New York, July 9, 2020, p. 14 ("Taken together, the wrongful convictions discussed here all point to failures of the prosecution as an institution —whether through acts of individual prosecutors, collective decisions, or *failure to train or guide prosecutors adequately*") (emphasis added); p. 60 ("In many of the cases, prosecutors … failed to disclose important relevant evidence.  And in a number of cases, prosecutors failed to adhere to expectations of candor and diligence, thereby denying the defendants a fair trial").[7]

180.    Hynes' policy of suppressing *Brady* material is also demonstrated by Hynes' *personal suppression* of *Brady* material —in full view of executive staff— in the high-profile Samuel Kellner prosecution in 2011, the same year Viera's case began.  *See e.g.* CBS News, Samuel Kellner Accused Of Paying False Witness $10K To Testify In Rabbi Abuse Case (https://www.cbsnews.com/newyork/news/man-accused-of-paying-false-witness-10k-in-testify-in-rabbi-abuse-case/), April 13, 2011.

---

[7]*See* http://www.brooklynda.org/wp-content/uploads/2020/07/KCDA_CRUReport_v4r3-FINAL.pdf (last visited February 14, 2024).

181.     In 2008, Kellner's 16-year-old son told him that Baruch Lebovits, a prominent Hasidic cantor, had molested him in a car.   Kellner went to prosecutors but was told that a trial was unlikely because of the nature of the touching and the age of his son.  So he began working with a sex crimes detective to find other victims who had been more seriously violated.

182.     Kellner's efforts were successful: A young man testified that Lebovits had serially molested him, and Mr. Lebovits was sentenced to 10 to 32 years in prison.

183.     In 2011, however, Kellner was arrested based on evidence collected by supporters of Lebovits.  He was indicted on a charge of paying $10,000 to the young man to falsely tell a grand jury that he had been abused by Lebovits. Kellner was also charged with attempting to extort $400,000 from Lebovits' family by telling them he could convince the witness not to testify.

184.     Unbeknownst to Kellner, Lebovits' attorney, in an attempt to secure Lebovits a non-jail disposition, admitted to the DA's Office that Lebovits had in fact molested the young man.  This was critical *Brady* material for Kellner because he could not be guilty of paying to fabricate allegations of abuse by Lebovits when Lebovits had already confessed to committing that very abuse.

185.     Moreover, Leobvits' attorney had a forensic psychiatrist, Dr. Goldstein, prepare a detailed report alleging "the sexual acts were all consensual without force or coercion" and "Lebovits' deviant sexual behavior was compulsive in nature. He had difficulty resisting temptation and controlling his sexual impulses at the time.  The relief and gratification his behavior afforded him were short-lived and quickly followed by extreme guilt, contrition, and

depression at his loss of control."   The report was submitted to the DA's Office *two years before Kellner was even indicted.*

186.    On July 3, 2013, Kellner's attorneys wrote the DA's office demanding production of any such *Brady* material: "I will be asking for a representation in open court that Baruch Lebovits did not at any time … indicate a willingness, through counsel, to plead guilty in respect of offenses committed against [the victim] (in exchange for an agreeable disposition) …. Obviously, the withholding of information to this effect would constitute a grave violation of your *Brady* obligations."  Exhibit H.

187.    In response, *Hynes personally edited* a July 5, 2013, response letter, Exhibit I, that concealed Dr. Goldstein's critical report.   *See* Exhibit J (Email of Chief of Trials Joseph Alexis to Rackets Division Chief Michael F. Vecchione, July 2, 2013):

"I worked in the DA's revisions."

188.    Hynes' suppression was undertaken in full view of  his executive staff, and he then had two of those staff members present his misleading letter to Kellner's attorney.  Dr. Goldstein's report was thus suppressed throughout the entirety of Kellner's criminal case.

189.     It was not until Kellner brought a civil lawsuit three years later, after his criminal case was dismissed, that Kellner finally learned of the existence of Dr. Goldstein's report through civil discovery.  *See Kellner v. The City of New York et al.*, 17 CV 01268 (E.D.N.Y.) (NRM) (MMH).

190.    Hynes' deliberate indifference to the violation of defendants' constitutional rights by his employees is also demonstrated by his failure to investigate, supervise, and discipline prosecutors for their pattern of violating the rights of criminal defendants through the knowing

use of false evidence, suppression of evidence required to be disclosed under *Brady* and its progeny, coercion of witnesses, and false or misleading summation arguments.

191.    Hynes' deliberate indifference in that regard effectively encouraged those employees to commit those acts, and created an "anything goes" atmosphere that caused such violations to continue, including those in Viera's case.

192.    In that regard, Hynes and his top lieutenants, his counsel, Dino Amoroso, his Chief of investigations and former Chief of the Homicide Bureau Michael Vecchione, his Chief Assistant, Amy Feinstein, and numerous other ADAs and supervisors, admitted in sworn depositions in *Collins v. City of New York*, *et.*, 11 CV 766 (FB) (RML) (E.D.N.Y.), *Zahrey v. City of New York,* No. 98 Civ. 4546, 2009 WL 54495 (S.D.N.Y.), and other cases, that Hynes and the KCDA had no written *Brady* disclosure policy, no formal rules of behavior governing how cases would be prosecuted and when (if ever) discipline for misconduct would be warranted, and no formal disciplinary system for investigating or disciplining prosecutors who violated the rights of criminal defendants.

193.    While Hynes maintained an Employee Manual governing relatively minor issues such as the use of office equipment and time sheets, and penalties for violating those policies, there were no written standards by which prosecutors' conduct during the course of criminal cases would be assessed for discipline, much less any possible penalty that could be imposed.

194.    The KCDA representatives above testified that the KCDA's informal disciplinary "procedure" was for Hynes himself to review all criticisms or complaints about prosecutors. They testified, under oath, that while dozens of court decisions documenting the misconduct of

KCDA prosecutors were brought to Hynes' attention, Hynes failed to report the offenders to outside attorney disciplinary bodies.

195.    A list of 78 cases in the 24-year period preceding Viera's January 2014 trial that gave Hynes notice of the need to investigate, supervise, and discipline his prosecutors and investigators with respect to their handling of their *Brady* obligations is attached as Exhibit G, and yet the KCDA representatives testified *there was not a single instance in which Hynes directed that any internal disciplinary investigation be conducted, let alone that any discipline be imposed.*

196.    To the contrary, KCDA's personnel records establish Hynes and his managerial staff almost invariably gave good evaluations, recommendations, promotions, and pay raises to prosecutors they knew had been alleged or found to have engaged in such misconduct, recommended some of them for judgeships and others for awards, and otherwise ratified the misconduct by aggressively defending it even after it was exposed.

197.    When Hynes received letters from the public or public officials praising his prosecutors, Hynes *personally* wrote to the prosecutors informing them that he had received the complimentary report, and praised the prosecutors.  In contrast, when prosecutors' conduct in their handling of a criminal case was criticized, Hynes  ignored it, never investigated it, and never confronted the prosecutor about the alleged behavior.

198.    Likewise, while Hynes' complimentary letters would be included in the prosecutors' personnel files, no notation would be made about any of the complaints or evidence of the prosecutors' wrongdoing.

199.    When a court explicitly found that a prosecutor committed misconduct, no record was kept in the prosecutor's personnel file of the finding or in a central file, making it virtually impossible to track repeat offenders or to take a prosecutor's behavior into account before transferring the prosecutor to bureaus where the consequences of such misconduct were at their highest.

200.    Despite dozens of court decisions finding prosecutors had wrongfully failed to disclose evidence actually or potentially favorable to the defense that should have been disclosed under *Brady*, *Giglio, Rosario*, or statutorily mandated discovery procedures, or otherwise had engaged in conduct that misled the court, jury, and/or defense, Exhibit G, none of the prosecutors involved were ever disciplined.

201.    The KCDA personnel files of the prosecutors in the 78 cases listed in Exhibit G where prosecutorial misconduct was found from between 1989 through 2013 reveal no documentary evidence of disciplinary action ever being taken against the prosecutors, no notations of their misconduct, and Hynes conceded during his deposition testimony in the Jabbar Collins case that he took no remedial action with respect to such conduct.

202.    Moreover, prosecutors who courts found to have committed misconduct were placed in supervisory and training positions over new ADAs, essentially ensuring that improper practices would be repeated.

203.     Despite the 78 judicial findings of misconduct, Exhibit G, not once during Hynes' 24 years in office did he ever terminate a prosecutor for prosecutorial misconduct.[8]

204.     Against this backdrop of the lack of a disciplinary infrastructure, Hynes kept win/ loss statistics, making a prosecutor's conviction rate a key factor in his or her ability to advance their careers within the office.

205.     Hynes also communicated to his executives his indifference to wrongfully prosecuted defendants by referring to even *innocent* defendants who had been wrongfully imprisoned as "mutts," and seeking to protect the prosecutor who wrongfully incarcerated them.

206.     In that regard, Damien Crooks was one of four men arrested in 2011 —the same year the case against Viera began—- for repeatedly raping and prostituting a woman from Crown Heights for nearly a decade.   Following the arrest, Crooks and his codefendants were defamed in the press and held on Rikers Island for nearly a year.

---

[8]Indeed, Hynes' rampant violations of the New York Conflict of Interest Law virtually ensured he would never deal with prosecutorial misconduct seriously as disciplining errant prosecutors could lead to public disclosure of his own misconduct.  Hynes and eight members of his executive staff admitted that in their efforts to assist Hynes' 2013 election campaign, they each violated New York City Charter § 2604, conduct constituting a Class A misdemeanor (misusing City resources).  *R.A.C. Group v. Board of Educ. of City of New York*, 21 A.D.3d 243, 247-248 (2d Dep't 2005)("A person who violates New York City Charter § 2604 is guilty of a misdemeanor, and forfeits his or her public office or employment upon conviction[.]"); Penal Law § 55.10 (2)(b) (providing any misdemeanor defined outside of that statute without specification "shall be deemed a class A misdemeanor").  Hynes and his executive staff each admitted in detailed stipulations to the New York City Conflict of Interest Board that between 2012-2013 —while Viera's case was pending—  they violated § 2604 of the New York City Charter by using City resources, time, or equipment to help Hynes in his effort to win reelection (by fending off public criticism of his wrongful convictions).  Hynes was fined $40,000 (the highest fine in NYC history for such conduct), Amy Feinstein, Chief Assistant District Attorney ($4,500 fine), Dino Amoroso, Deputy District Attorney ($4,500 fine), Henna White, Community Liaison to Orthodox Jewish Community ($4,000 fine), Anne Swern, First Assistant District Attorney ($2,000 fine), Lance Ogiste, Counsel to Hynes ($1,000 fine), Michael F. Vecchione, Chief of the Rackets Division ($1,000 fine), Marc Fliedner, Executive District Attorney ($800 fine), and Mary Hughes, Confidential Assistant District Attorney ($600 fine).  Yet even after Hynes' executives admitted to committing these acts, Hynes publicly declared they "did nothing wrong."

Relatedly, in June 2014 the FBI concluded "there is an articulable and factual basis HYNES engaged in criminal activity[,]" in the use of nearly $1,000,000 in civil forfeiture funds to pay a political consultant to work on his 2013 election campaign, Exhibit K at p. 5.  The FBI then approved a "full field investigation" culminating in the US Attorney's Office convening a federal grand jury (Hynes was not indicted).  Thus, the overall culture of Hynes' administration was one of misconduct and cover-up.

207.     However, nine months after the defendants were indicted, it emerged that months *before* the case was even presented to the grand jury, the woman had fully recanted her accusations.  The woman admitted to police and prosecutors that she was a prostitute, that she had not been raped, that any sex had was consensual, and that she actually liked Crooks.  The DA's Office also learned the woman had significant psychiatric issues, including, among other things, mood disorder, bipolar disorder, personality disorder, schizophreniform disorder, and hallucinations.  None of this information was disclosed to the four defendants or their attorneys during the nine months the defendants were incarcerated on Rikers.

208.     Following revelation and intense media coverage of this suppression, Hynes proposed to defend the trial prosecutor's non-disclosure by issuing a press release asserting *Brady* did not require the exculpatory information to be disclosed at such an early stage of the case (*nine months* after the defendants were indicted and incarcerated).

209.     When Hynes' advisors counseled him not to release that press statement, Hynes convened an internal "ethics panel" that cleared the prosecutor of wrongdoing "because def[ense] counsel received all the disclosures well before trial — so no harm no foul."  Exhibit L (ADA Rebecca Gingold's June 7, 2012, Memo to Michael Vecchione in *People v. Crooks*, p. 4 at 5/24/12 Time Line Entry).

210.     Even when the need to dismiss the case against these innocent defendants was inescapable, Hynes emailed his Chief of Rackets asking if "these two mutts" admitted to consensual sex with the complainant.  Exhibit M at p. 2.  It was only when Hynes was reminded

that the complainant was a "totally unbelievable woman[,]" *id.,* that he authorized dismissal of the charges.[9]

211.    The above policies, customs, and practices, collectively referred to here as the "Hynes Trial Policies," caused Viera's wrongful arrest, prosecution, and conviction.

212.    A number of cases handled by Hynes' office during the time period preceding Viera's arrest and prosecution illustrate the Hynes' Trial Policies in action.

213.    Shortly after Hynes assumed office in 1990, he defended the wrongful conviction secured by his predecessor in the infamous Waldbaum's Supermarket Fire case in which six New York City firefighters died.   Hynes' predecessor convicted a man named Eric Jackson of a purported "arson" that killed the firefighters and convinced the court to sentence Jackson to 25 years to life.

214.    However, the trial court vacated the conviction based on the KCDA's admission that homicide prosecutor, Jon Besunder, suppressed *Brady* material from Jackson indicating a fire expert deemed the fire an accidental one, that the Fire Department likely fabricated the arson to ensure the firefighters' families received greater death benefits, and that there was evidence that undercut Jackson's confession.

215.    In June 1990, the Appellate Division affirmed the trial court's decision to vacate the conviction based on Besunder's suppression of this devastating *Brady* material.

---

[9] Hynes' indifference to his subordinates' conduct, and backing them no matter what, extended beyond their misconduct in handling criminal cases.  Hynes and other executives in the office knew that his homicide chief, Michael Vecchione, had a sexual relationship with Vecchione's subordinate, Stacey Frascogna, and had promoted her.  DA payroll records show that Ms. Frascogna was earning $33,000 in 1995 but, within three years of her trip to Puerto Rico to locate a witness in the Jabbar Collins case,  Frascogna was promoted to Deputy Bureau Chief and was earning an annual salary, with bonuses, of $105,500.00. Vecchione publicly admitted the Frascogna relationship but denied that it was going on at the time he took her to Puerto Rico.  Nevertheless, Hynes took no action and conducted no investigation of Vecchione's conduct.

216.    Just a month after the Appellate Division's affirmance, however, Hynes promoted Besunder to First Deputy Chief of the KCDA Homicide Bureau.  Besunder testified at a deposition in the Jabbar Collins case that neither Hynes nor anyone from the KCDA ever questioned him about the Jackson case, or even brought up his conduct in the case before or after promoting him.  *See* Deposition of Jon Besunder in *Collins v. City of New York*, 11 CV 766, April 19, 2013, pp. 136-137.

217.    Following the KCDA's appeal, Jackson's case was remanded for an evidentiary hearing, during which the trial court explicitly found Besunder's testimony at the hearing was "evasive and disingenuous." *People v. Jackson*, 154 Misc.2d 718, 722 (Sup Ct. Kings Co. June 12, 1992).

218.    Yet even after this additional finding, Besunder was never questioned, disciplined, or sanctioned.  Instead, Besunder continued in his supervisory position and was later appointed Executive DA, training younger ADAs on the Riding Program that was designed to, among other things, avoid creating a record of evidence a defendant could use to challenge his case.

219.    In February 1992, Hynes communicated to his employees his views about witness coercion and abusing court process by vigorously defending the murder conviction his office obtained in *People v. Russ*, 79 N.Y.2d 152 (1992).  The case was built on the testimony of two teenage girls who, before trial, recanted their statements to police and to the grand jury. When one of the girls, Ms. Lawrence, testified that she had not seen the defendant commit the crime and then, in the midst of being challenged by the prosecutor, invoked her Fifth Amendment right against self-incrimination, the following astounding events occurred:

> [T]he prosecution interrupted Lawrence's midafternoon testimony
> and obtained a continuance.  Lawrence, then 17 years old, was (1)
> arrested; (2) charged with perjury; (3) taken in handcuffs crying
> and frightened to the District Attorney's office; (4) interrogated and
> threatened with 2 to 7 years in prison; (5) removed to Central
> Booking for fingerprinting; (6) held until 5:00 A.M. the next
> morning without sleep; (7) moved to a precinct lockup; and (8)
> returned to court at 9:00 A.M. where she was kept in handcuffs
> except for her time on the stand.  Lawrence's post-arrest and post-
> incarceration testimony, tending to inculpate defendant by
> describing his role in the mugging, resulted immediately in the
> perjury charges being dropped.  She was only then released from
> police custody.

79 N.Y.2d at 177.

220.    In reversing the conviction, the court condemned the "egregious" behavior of the

KCDA in "legally coercing [Lawrence's] testimony."  *Id.* (citing *Rochin v. California*, 342 U.S.

165, 172 (1952) (conduct that "shocks the conscience").  That the jury heard what had occurred

and could judge the witness' credibility was "not adequate," the court emphasized.

221.    In the 1993 Ruddy Quezada case, Quezada was convicted based on the testimony

of star witness Sixto Salcedo.  During trial, the prosecutor portrayed Salcedo as a voluntary

witness with no reason to lie.  Years later, however, Salcedo recanted his trial testimony,

explaining that he had been arrested on a material witness warrant and held against his will at a

hotel by the KCDA.   (Civil complaint in *Quezada v. Hynes*, *et. al.*, 16 CV 6577 (MKB) (SMG)

(Doc. # 1) (E.D.N.Y.), which we incorporate here and in all following paragraphs).

222.    A high level appellate prosecutor scoffed at Quezada's claims, arguing they were

untrue, there was absolutely no evidence to support them, and there was "no copy of a material

witness order in the file."  The trial prosecutor, who was by then a supervisor in the KCDA,

denied any knowledge of the material witness warrant as well.

223.     Years later, when a federal habeas court ordered discovery, the KCDA produced the supposedly non-existent material witness warrant and hotel custody records confirming Salcedo's account.   The material witness warrant had been obtained by the very trial prosecutor who had sworn under oath that he had no knowledge of it.

224.      The case was remanded to state court, and Hynes took the position that the KCDA's suppression and misrepresentations regarding the material witness warrant and hotel custody did not constitute a *Brady* violation or entitle Quezada to any relief.

225.     During discovery in state court, the KCDA turned over an email establishing the appellate prosecutor who had claimed there was no material witness warrant in the file, like the trial prosecutor, had personal knowledge of the warrant long before she made her false representations.

226.     Yet Hynes neither investigated nor disciplined the trial or appellate prosecutors, or acknowledged their conduct violated Quezada's right to due process.  Instead, he continued to defend their conduct and the conviction secured through their suppression.

227.     It was not until the new Kings County District Attorney, Kenneth Thompson, came into office that the KCDA finally did the right thing.   The KCDA fired the appellate prosecutor and consented to vacatur and dismissal of all charges against Quezada.[10]

228.     Hynes' acquiescence to such misconduct as a matter of policy is also demonstrated by his failure to sanction outrageous misconduct by ADA Mark Hale, a Deputy Bureau Chief at the time, during the 1998 trial of Vladimir Campos, *People v. Campos*, 281 A.D.2d 638, 638 (2d Dep't 2001), a potential death penalty case.  During direct examination, a

---

[10]The City ultimately agreed to pay Quezada $9,000,0000 to settle his civil case asserting, among other things, a *Monell* claim based on Hynes' policies.

key witness blurted out that detectives had coerced him into making a statement incriminating

Campos, and that prior to trial he had recanted his statement when meeting with Hale, and later

failed a lie detector test.  The defense objected that Hale had failed to disclose any of this

information and moved for a mistrial.

229.    Hale responded by arguing, in accordance with the Hynes' Trial Policies, that the

witness' pretrial recantation was not *Brady* material because it was not credible.[11]

230.    When the Court asked Hale whether he "had any knowledge of the purported lie

detector test," Hale falsely stated to the Court that he did not:

> "MR.  HALE:  No, Judge.  I don't recall.  I don't have
> anything in my file about that.  The Court knows that I wasn't on
> this case right from the get-go.  I'm not seeing anything in my files
> that purports to do that."

*Id.* at 442.

231.    But during a hearing on the *Brady* issue two days later, the DA's Office revealed

that, in truth, Hale himself requested the lie detector test and had personally prepared the

questions.  *Id.* pp. 464-465, 476-477.  It was also revealed that Hale had affirmatively misstated

to the defense that the witness never recanted his story.  *Id.* at 494.

232.    The trial court, the Honorable Carolyn Demarest, found that the pretrial

recantation and polygraph test constituted *Brady* material, that Hale was "absolutely without

justification" in failing to disclose it, and that Hale's false representations to the court were

"prosecutorial misconduct."  *Id.* 499.  As a sanction, Judge Demarest struck the testimony of the

witness in its entirety and gave the jury a curative instruction.

_____

[11]Trial Transcript in *People v. Campos*, Kings Co. Ind. No. 790/98, p. 441.

233.    Despite this explicit judicial finding of Hale's misconduct, he was not investigated, sanctioned, disciplined, or penalized for it.  Hale maintained his supervisory position in the DA's Office, and continued to receive promotions, including a promotion to Chief Counsel to Hynes along with a pay raise.  Nor was the court's finding of misconduct placed in Hale's personnel file, preventing any successor DA from learning of Hale's misconduct.

234.    But the most egregious and revealing example of the Hynes Trial Policies and Hynes' indifference to such conduct is the case of Jabbar Collins.  (Civil complaint in *Collins v. City of New York*, *et.*, 11 CV 766 (FB) (RML) (E.D.N.Y.)(Doc # 1), which we incorporate here and in all following paragraphs.)

235.    Collins was arrested in 1994 and prosecuted in 1995.

236.    In 2006, Collins brought a post-conviction motion documenting, among other misconduct, *Brady* violations, witness coercion, and the knowing presentation of false evidence and argument by prosecutor Michael Vecchione, then chief of the KCDA's Homicide Bureau, later Hynes' Chief of Investigations, and Hynes' close confidante.

237.    Rather than investigate whether Collins' allegations were true, Hynes assigned several attorneys who were Vecchione's direct subordinates, and who were second seating him on several high-profile cases, to defend Vecchione's conduct no matter how egregious they found it to be.

238.    These prosecutors presented in court a false sworn affirmation by Vecchione denying the allegations, which caused Collins' 440  motion to be denied.  However, proceedings in Collins' subsequent federal habeas corpus action before the Honorable Dora L. Irizarry, *Collins v. Ercole*, 08 CV 1359 (DLI), forced the KCDA to disclose extensive *Brady* material the

KCDA had all along but had withheld from Collins.  The disclosure revealed that Vecchione's

sworn affirmation, used to defeat Collins' state 440 motion, was perjurious.

239.    Yet Hynes continued to support Vecchione, declared he had done nothing wrong,

and held him out as exemplifying the qualities that served as an example to other prosecutors in

the office.  Ultimately, in granting Collins' habeas petition, dismissing the underlying state

indictment, and releasing Collins from custody after 16 years of wrongful imprisonment, Judge

Irizarry condemned Hynes and the KCDA for defending Vecchione's misconduct and for Hynes'

failure to properly train, supervise, and discipline his staff.

240.    In the face of those egregious constitutional violations, Hynes had his prosecutors

declared on the record during the June 8, 2010 proceeding dismissing the case before Judge

Irizarry —just a year before Viera's case began— that:

> "This Office stands behind the conduct of former Assistant District
> Attorney Posnor and Frascogna and current Assistant District
> Attorney Vecchione, who prosecuted the defendant at his trial,
> along with the Office's staff and detective investigators who
> assisted them[.]"

241.    Within a day of the dismissal, Hynes told media representatives that Vecchione is

a "very principled lawyer," "was not guilty of any misconduct," and that he would not conduct

any investigation into Vecchione's conduct.

242.    Hynes summarily declared Vecchione would face no disciplinary action. Hynes

thereafter promoted Vecchione and continued to praise him.  Collins then brought a *Monell*

action against the City based on Hynes' policies and ratification of Vecchione's misconduct.  The

Honorable Frederick Block excoriated Vecchione's conduct and Hynes' failure to investigate it.

Yet even after Judge Block's condemnation, which was reported in virtually all major New York

newspapers, Hynes did not even read Collins' civil complaint, 440 papers, or habeas petition to review Vecchione's conduct.  Deposition of Charles J. Hynes, *Collins v. City of New York*, 11 CV 766 (FB)(RML), December 19, 2013, p. 12.  Meanwhile, the City ultimately paid Collins $10,000,000 in damages to settle his lawsuit.

243.    Even after Hynes was voted out and left office in December 31, 2013, the new and subsequent administrations —which continued Freeman and Viera's prosecutions— *continued* Hynes' policies, including failing to discipline prosecutors for suppressing *Brady* material and using false evidence and argument, and withholding objectively favorable evidence simply because the prosecutor subjectively disbelieved the evidence.

244.    For example, in May 2022, the DA's Office fired a prosecutor who blew the whistle about another prosecutor suppressing *Brady* material, and protected and later promoted the prosecutor who suppressed the *Brady* material.  Specifically, in May 2021 —while Freeman and Viera were on Rikers awaiting retrial— ADA Kamephis Perez was assigned to work on an appeal filed by a man named Rashan Hay.  *People v. Hay*, Kings Co. Ind. No. 9123/2014.

245.    Hay was convicted in August 2016, shortly after Freeman and Viera, of burglary in the second degree as a sexually motivated felony, attempted rape in the first degree, and related charges.

246.    ADA Alanna Tierney prosecuted Hay's case.

247.    The principal evidence against Hay was the testimony of the complainant.

248.    The complainant alleged that Hay unexpectedly showed up at her apartment, pushed his way in, and sexually assaulted her.

249.    The complainant testified at trial that she and Hay used to be involved in a

romantic relationship, but that their relationship had ended a year prior to the alleged incident.

250.    The complainant also testified that she had not communicated with Hay in months prior to the day of the incident.

251.    Hay testified in his defense and denied the complainant's allegations.

252.    According to Hay's testimony, he and the complainant were dating at the time of the alleged incident, and he never assaulted her.

253.    Contrary to the complainant's testimony, Hay also testified that he and the complainant remained in a relationship and in close and regular contact leading up to the day of the alleged assault, including with frequent phone calls and text messages.

254.    The jury convicted Hay.

255.    Hay was sentenced to ten years in prison.

256.    While working on the People's opposition to Hay's appeal, Perez examined the trial file in detail.

257.    In doing so, Perez came across certain phone records, including a document logging the calls made by, and received from, the complainant's phone (the "Complainant's Call Log").

258.    The Complainant's Call Log called into serious doubt the truth of a number of key aspects of the complainant's testimony at trial.

259.    The Complainant's Call Log showed that, consistent with Hay's testimony, the complainant and Hay had in fact been in regular contact by phone leading up to the day of the incident, contrary to her testimony that they had not spoken in several months.

260.     Perez believed that the Complainant's Call Log was favorable evidence for Hay since, if it had been produced to the defense, it could have been used to impeach the testimony of the complainant at trial.

261.     Perez reported his findings to his supervisor, ADA Jodi Mandel, who instructed him to contact the trial prosecutor, Tierney.

262     Perez called Tierney and during that call, Tierney referred to Hay as a "scumbag" and a "piece of shit."  Unaware of the nature of the call, she revealed to Perez that:

(1)     The complainant was initially cooperative but then stopped responding to Tierney, shortly after the criminal complaint was signed;

(2)     Tierney and an investigator had posed as a married couple to get into a maternity ward to try and convince the complainant to testify;

(3)     Tierney believed the complainant had been having an affair Yannick Phillips, another witness who like the complainant, swore under oath that they were *not* having an affair;

(4)     Tierney anticipated Phillips would be uncooperative and prepared a Material Witness Order in advance of a meeting with Phillips at the DA's Office;

(5)     Phillips showed up to her office for the meeting with counsel and then pled the Fifth when Tierney questioned him about the case;

(6)     Tierney threatened Phillips that if he did not cooperate with her, she would serve him with a material witness order while he was sitting down to dinner with his family, thus outing his affair with the complainant to his wife;

(7)     Another witness, Modesta Ortiz, who claimed at trial to have heard yelling from the complainant's apartment, suffered from "auditory hallucinations;" and

(8)     When Tierney knocked on Ortiz's door, Ortiz told her that she had met Tierney in a dream last week, before the incident occurred, so she was expecting her

263.    None of the above information was disclosed to Hay or his defense attorney.

264.    Perez then contacted executives in the DA's Office and informed them of
Tierney's suppression of *Brady* material, and his belief that Hay was wrongfully convicted.

265.    On or about June 16, 2021, the DA's Chief Assistant Nancy Hoppock convened a
Teams video meeting about the issues Perez reported.

266.    Present at that Teams video meeting were (a) Perez's supervisor Jodi Mandel; (b)
Perez; (c) Tierney; (d) Hoppock; (e) Kevin O'Donnell; (f) Appeals Deputy Bureau Chief
Bruffee , and (g) Miss Gregory, the Bureau Chief of the KCDAO's Special Victims Unit.

267.    Upon information and belief, Ms. Hoppock took detailed notes of the meeting
and/or it was recorded.

268.    This collection of individuals was outside the typical chain of command for
resolving issues concerning the usual duties of an Appeals Bureau lawyer.

269.    Hoppock agreed during that meeting that Tierney's failure to produce the
Complainant's Call Log was a *Brady* violation.

270.    There was then a discussion during the Teams meeting concerning how to go
about producing the Complainant's Call Log to Hay's appellate attorney (Hay's appeal was
pending).

271.    Tierney criticized the decision to even convene the meeting at all and called out
Perez in particular.  In a rage, Tierney abruptly logged off the Teams meeting.

272.    On or about July 28, 2021, Perez was called into a meeting with Hoppock.
Hoppock informed Perez that the DA's Office decided to disclose the Complainant's Call Log to
Hay's appellate attorney  (with significant redactions).  However, Happock said the DA's Office

decided the remainder of the evidence Perez uncovered, *see supra* at ¶ 262, in the DA's view, did not have to be disclosed because it was insufficiently corroborated.

273.    The DA's Office's decision in this regard, to withhold this favorable evidence (¶ 263, *supra*) simply because it was not in the DA's view sufficiently corroborated, directly implemented the Hynes' policy of withholding favorable evidence if the prosecutor subjectively disbelieved it, ¶ 171 (d).[12]

274.    Further implementing the Hynes' policies, the DA's Office did not discipline Tierney for suppressing *Brady* material and suborning the complainant's false testimony and refusal to cooperate at the Teams meeting.  Instead Tierney was *promoted* to Deputy Bureau Chief.

275.    In contrast, shortly after the Teams meeting, the DA's Office suspended Perez, and then *fired* him fired for blowing the whistle on Tierney's *Brady* violations.

276.    While the DA claimed Perez was being fired because of alleged discrepancies between his timecard, that explanation was pretextual.

277.    Tellingly, the prosecutor that handled Perez's firing, Confidential Executive Assistant Maritza Mejia-Ming, had significant deficiencies in her own time cards yet she faced no disciplinary action, much less termination.  *See e.g.* Hella Winston and Susan Edelman, *Brooklyn DA promotes aide who trashed Jewish colleagues, uses office for personal benefit,* New York Post, July 29, 2023 (DA spokesman stating "[a]ny deficiencies [in Ming's time cards] will

---

[12]New York law long ago declared this was illegal.  *People v. Baxley*, 84 N.Y.2d 208, 213–14 (1994) ("[N]ondisclosure cannot be excused merely because the trial prosecutor genuinely disbelieved [witness'] recantation") (citation omitted); *People v. Robinson*, 133 A.D.2d 859, 860 (2d Dep't 1987) ("Even if the prosecution had valid reasons to consider this witness to be unreliable, it should nonetheless have provided the defense with [the witness' statement] which was clearly *Brady* material.")

be remedied promptly") (https://nypost.com/2023/07/29/brooklyn-da-promotes-aide-who-terrorizes-staff-flouts-rules/).[13]

278.    The Hynes' policies detailed above individually and collectively, caused, permitted, encouraged, or acquiesced in the commission of constitutional violations of the rights of suspects and defendants by prosecutors, detective investigators, and NYPD detectives and officers working with ADA Carvajal, and substantially caused her misconduct at Viera's trial and the violation of Viera's constitutional rights.

279.    The foregoing violations of Viera's federal constitutional rights and resultant injuries were directly, foreseeably, proximately, and substantially caused by conduct chargeable to the City, amounting to affirmative policies, practices, and customs, and deliberate indifference to the constitutional rights of persons subject to prosecution by the DA's Office, namely, those identified above, and:

 (a) the institution and implementation of plainly inadequate or unlawful policies, procedures, regulations, practices, and/or customs concerning:

  i. the duty not to use false, misleading, or unreliable evidence, testimony, statements, or argument during criminal proceedings, including bail hearings, pretrial hearings, and trial;

  ii. the continuing obligation to correct false, inaccurate, incomplete, or misleading evidence, testimony, statements, and argument whenever such misconduct is discovered to have occurred, including moving or consenting to overturn convictions discovered to have been obtained through such unconstitutional means;

  iii. the continuing duty to obtain, to preserve, and make timely disclosure to the appropriate parties, including the court and the defense, during criminal investigations and prosecutions, of all material evidence or

---

[13]On August 18, 2023, Perez sued the City, current Kings County DA Eric Gonzalez, and Ming for wrongful termination. *Perez v. City of New York, et. al.,* 23 CV 6253 (LDH)(RML).

information favorable to a person suspected, accused or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching the credibility or undercutting the reliability of prosecution witnesses, and including verbal as well as recorded information;

iv.      the duty to refrain from abusing court process or otherwise coercing or manufacturing false or inherently unreliable statements and testimony from witnesses; and

(b)      the failure to adequately investigate, instruct, supervise, and discipline their employees with respect to such matters, or to rectify such practices.

280.    The aforesaid affirmative or *de fact*o policies, procedures, regulations, practices, and/or customs were implemented or tolerated by policymaking officials for the City, including, but not limited to, Hynes and his delegates, who knew:

(a)      to a moral certainty that such policies, procedures, regulations, practices, and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

(b)      that such issues either present employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, supervision and/or discipline was demonstrated by a history of employees mishandling such situations as well as the incentives that employees have to make the wrong choice; and

(c)      that the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him constitutional injury.

281.    The aforementioned policymaking officials had the knowledge alleged in the preceding paragraph, based upon, among other circumstances:

(a)      as noted above, numerous credible allegations, many substantiated by judicial decisions, Exhibit G**,** that ADAs had wrongfully withheld, lost, or destroyed evidence favorable to the defense that the prosecution had been required to timely disclose to the defense under *Brady,* had presented or failed to correct false or misleading testimony and argument, and/or had used improper summation arguments,

56

(b)     civil lawsuits, some of which resulted in substantial civil settlements, alleging that police and/or ADAs had falsified, exaggerated, or withheld evidence, thereby wrongfully injuring individuals suspected or accused of crimes; and

(c)     numerous decisions of the U.S. Supreme Court, the U.S. Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Divisions, recognizing the difficult issues that regularly arise under the *Brady* rule and the failures of New York City or Brooklyn prosecutors to comply with that rule;

(d)     judicial decisions putting Hynes on notice that the City could be held liable for its failure to adequately investigate, supervise, or discipline ADAs regarding their *Brady* and related due process obligations, including their obligations not to abuse judicial process or coerce false or unreliable statements and testimony, *see, e.g.*, *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992); *Ramos v. City of New York*, 285 A.D.2d 284, 729 N.Y.S.2d 678, 692-96 (1st Dep't 2001), *Leka v. City of New York*, 04 CV 8784 (DAB); *Zahrey v. City of New York*, et al., 98 Civ. 4546 (DCP); *Collins v. City of New York*, 11 CV 766 (FB) (RML).

282.     Despite this knowledge, the supervisory and policymaking officers and officials of the City perpetuated, or failed to take preventative or remedial measures to terminate said policies, procedures, regulations, practices and/or customs, did not effectively instruct, investigate or supervise their personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority, as described above, with deliberate indifference to the effect of said policies, procedures, regulations, practices and/or customs upon the constitutional rights of residents and citizens of the City and the State of New York.

283.     The aforesaid policies, procedures, regulations, practices, and/or customs of the City were collectively and individually a substantial factor in bringing about the violations of Viera's rights under the Constitution and Laws of the United States and in causing his damages.

284.     Under the principles of municipal liability for federal civil rights violations, the District Attorney of Kings County (or his authorized delegates) has final managerial responsibility for instructing, supervising and disciplining attorneys and other employees in his office regarding their conduct in the prosecution of criminal matters, including, but not limited to, their obligations not to coerce witnesses or manufacture false or unreliable "evidence," not to abuse judicial process, to make timely disclosure of exculpatory evidence or *Brady* material to the defense, including post-trial, and to refrain from offering, and to correct, false or misleading evidence, testimony, and argument during pretrial, trial, and post-trial proceedings.

285.     Hynes, who was the highest-ranking New York City official with responsibility for setting and enforcing policy with respect to managing his office's personnel and the functions of the office, had final policymaking authority in all such areas.

286.     Hynes, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline, with respect to his office's performance of its duties.

287.     Hynes at all relevant times was an elected officer of Kings County, one of the constituent counties of the City, and the office was and is funded out of the City's budget.

288.     Furthermore, Hynes, as the District Attorney, was and is designated a "local officer," rather than a "state officer," under the New York Public Officers Law (§ 2) and federal *Monell* jurisprudence, *Bellamy v. City of New York*, 914 F.3d 727 (2d Cir. 2019); and New York has provided by statute (N.Y. County Law§§ 53, 941) that the City's constituent counties

(including Kings County), and hence the City itself, shall have liability for torts committed by County officers and employees, such as the District Attorney and his assistants.

289.   Hynes, personally and/or through his authorized delegates, at all relevant times, had final authority and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

290.   During all times material to this Complaint, the City, through its policymakers, owed a duty to the public at large and to Viera, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

291.   By virtue of the foregoing, the City is liable for having substantially caused the foregoing violations of Viera's constitutional rights and his resultant injuries (¶ 135, above).

### FIFTH CAUSE OF ACTION
(*Monell*/42 U.S.C. § 1983: Claim Against the
City based on the conduct of the NYPD)

292.   Viera repeats the allegations in ¶¶ 1-291 of this Complaint, and incorporates them here and in all following paragraphs.

293.   Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner or his authorized delegates, during all times relevant to this Complaint, had final responsibility for training, instructing, supervising, and disciplining police

officers and other employees of the NYPD with respect to the investigation and prosecution of criminal matters, including but not limited to requirements governing:

      a.     the constitutional obligation not to fabricate evidence, including false identifications, for use against criminal suspects and defendants in criminal trials and other proceedings;

      b.     the constitutional obligation not to give false or misleading testimony; and

      c.     the constitutional obligation not to initiate or continue a prosecution without probable cause.

294.    During all times material to this complaint, the City, through its policymaking officials in the NYPD, owed a duty to the public at large and to Viera to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by their subordinates that would result in the violation of the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

295.    These policymakers knowingly and intentionally breached, or were deliberately indifferent to, this duty.

296.    At the same time as NYPD policymaking officials were deliberately indifferent to constitutional violations by their employees, these officials created substantial incentives for their employees to commit such constitutional violations by pressuring police officers to "close" cases through arrests, indictments, and convictions.

297.    The aforesaid deliberate or *de facto* policies, procedures, regulations, practices, and/or customs (including the failure to properly instruct, train, supervise, and/or discipline employees) were implemented or tolerated by policymaking officials for Defendant City—including but not limited to the Police Commissioner—who knew, or should have known:

60

(a)     to a moral certainty that such policies, procedures, regulations, practices, and/or customs concern issues that regularly arise in the investigation of criminal cases;

(b)     that such issues present NYPD employees with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult;

(c)     that NYPD employees facing such issues have strong incentives to make the wrong choices, especially given the pressure placed on NYPD employees to make arrests, close cases, and secure indictments and convictions;

(d)     that the wrong choice by NYPD employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused person and cause him constitutional injury; and

(e)     that NYPD employees had a history of making wrong choices in such matters.

298.    At the time of Viera's  arrest and prosecution, NYPD policymaking officials were on notice of the risk of misconduct by NYPD employees that would violate the constitutional obligations identified in ¶ 258, above.

299.    Policymaking officials were on notice based in part on numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division discussing the difficult issues that regularly arise for police officers during lineup procedures and other phases of criminal investigations.

300.    Policymaking officials were also on notice based on the inherent obviousness of the need to train, supervise, and discipline police officers with respect to their constitutional obligations to counteract the pressure on such officers to "close" cases and to obtain arrests and convictions.

301.    Policymaking officials were further on notice based on numerous credible allegations that NYPD officers had manufactured false or unreliable evidence, and/or knowingly given false or misleading testimony, in violation of the constitutional obligations identified in ¶ 258 by, among other circumstances:

(a)    Credible allegations, many substantiated by judicial decisions, finding that NYPD officers had wrongfully withheld material evidence or knowingly given false or misleading testimony;

(b)    Fifty civil lawsuits, from 1992 to 2000, some of which resulted in substantial civil settlements, credibly alleging that police had falsified, exaggerated, or withheld material evidence, or conducted searches or arrests without probable cause;

(c)    Numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under *Brady* as well as the probable cause requirement of the Fourth Amendment;

(d)    Judicial decisions directly criticizing the NYPD for failing to train and supervise officers in their Brady obligations and for failing to adopt adequate *Brady* disclosure policies, see Carter v. Harrison, 612 F. Supp. 749 (E.D.N.Y. 1985) (McLaughlin, D.J., adopting the Report and Recommendation of then Magistrate Shira A. Scheindlin), and putting the NYPD on notice that the CITY could be held liable for its failure to adequately train police officers and investigators regarding their obligations to provide truthful testimony and to disclose evidence that favors criminal defendants under *Brady*, *see Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), and *Carter v. Harrison*, above;

(e)    Formal reports of the New York City Comptroller's Office and the Bar Association of the City of New York criticizing the NYPD and the NYC Law Department for failing to follow up substantial civil settlements for police misconduct with disciplinary or other remedial action; and

(f)    The inherent obviousness of the need to train, supervise, and discipline police officers in such obligations to counteract the pressure on officers and the powerful incentives they have to close cases and to obtain arrests and convictions.

302.     These illegal practices were documented first in July 1994, following highly

publicized hearings, by the Report of the Commission to Investigate Allegations of Police

Corruption and the Anti-Corruption Procedures of the Police Department—more commonly

known as the "Mollen Commission Report," and continued up to the time Viera was arrested,

prosecuted, and convicted.

303.     The Mollen Commission "interviewed scores of former and current police officers

and supervisors." Mollen Commission Report at 36. It found that police perjury and falsification

of official records is probably the most common form of police corruption facing the criminal

justice system:

> …Regardless of the motives behind police falsifications, what is
> particularly troublesome about this practice is that it is widely
> tolerated by corrupt and honest officers alike, as well as their
> supervisors. Corrupt and honest officers told us that their
> supervisors knew or should have known about falsified versions of
> searches and arrests and never questioned them,
>
> …What breeds this tolerance is deep-rooted perception among
> many officers of all ranks within the Department that nothing is
> really wrong with compromising facts to fight crime in the real world.
> Simply put, despite the devastating consequences of police
> falsifications, there is a persistent belief among many officers that it
> is necessary and justified, even if unlawful. As one dedicated officer
> put it, police officers often view falsification as, to use his words,
> "doing God's work" – doing whatever it takes to get a suspected
> criminal off the streets.  This attitude is so entrenched, especially in
> high-crime precincts, that when investigators confronted one
> recently arrested officer with evidence of perjury, he asked in
> disbelief, "What's wrong with that? They're guilty."

Mollen Commission Report, p. 36, 40-41.[14]

304.     The same year the case against Viera began, 2011, the New York City

Commission to Combat Police Corruption —which was created by Mayoral Executive Order

following the Mollen Commission Report— issued its Thirteenth Annual Report[15] which

concluded the NYPD had watered down its false statement policy.

305.     In 1996, the NYPD's false statement policy  provided that termination was the

appropriate penalty for false official statements unless the Police Commissioner found that

exceptional circumstances existed that justified a less severe form of discipline.   However, in

2005, the NYPD modified the policy to mandate termination "only in those cases that involved

an intentional false official statement regarding a material matter."  p. 17.  Even worse, the

NYPD viewed officer "misstatements," even in official reports, outside of the scope of the cases

the Department would prosecute internally.  *Id.*

306.     In 2019, The Report of the Independent Panel on the Disciplinary System of the

New York City Police Department[16] concluded:

> (a)     "While the Patrol Guide provisions cited above expressly forbid officers
> from lying in connection with their duties, numerous stakeholders have
> expressed concerns about lax enforcement and practices that enable bad
> actors to escape accountability and avoid the presumptive termination
> penalty."  *Id.* at p. 39;

---

[14]*Accord* Amended Civil Complaint in *Negron v. City of New York*, 18 CV 6645 (DG) (RLM) (S.D.N.Y.) (Doc. # 1) at ¶¶ 213-373, incorporated here by reference (detailing numerous additional instances of police misconduct which provided the NYPD with notice of its officers misconduct, and establish the NYPD's policy of acquiescence and ratification).

[15]chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.nyc.gov/assets/ccpc/downloads/pdf/13th_annual_report.pdf

[16]On June 21, 2018, the NYPD Commissioner appointed an Independent Panel to conduct a review of the NYPD's internal disciplinary system, and to propose recommendations to improve it. The Panel consisted of the Honorable Mary Jo White, its chair; the Honorable Robert L. Capers; and the Honorable Barbara S. Jones.

(b)      "From January 2015 through August 2016,[17] most false statement related cases were not charged under § 203-08, but rather under the more permissive provisions of the Patrol Guide. Even where officers were found to have violated § 203-08, in the majority of cases, the Department's trial commissioners recommended punishments that allowed officers to remain employed despite the presumptive dismissal penalty." *Id.* at pp. 39-40;

(c)      The NYPD's practice of failing to properly charge officers with making false statements so as to have them fired has been a "focal point" in the New York City Commission to Combat Police Corruption's annual reports *for over 20 years, from 1996 to 2019*." *Id.* at p. 40 (emphasis added);[18]

(d)      "[H]istorically, the Department did not appear to consistently gather and analyze information about arrests that prosecutors decline to charge because of officer credibility concerns or cases in which judges make adverse findings about officer credibility[.]". *Id.* at p. 40; and

(e)      "[C]ertain historic practices may contribute to a culture in which false statements are condoned."  Specifically, "handing off" of arrests, in which the actual arresting officer allows a colleague to prepare the arrest report, become the 'arresting officer,' and earn the overtime that often comes with that designation. *Many stakeholders reported that supervisors tolerate this practice and that their tolerance promotes a culture in which more egregious falsehoods occur[.]*" *Id.* at p. 41 (emphasis added).

307.    These customs and practices were all in effect at the time of Viera's arrest, prosecution, and conviction.

---

[17]Post-incident evidence is relevant to a claim of municipal liability as it may "shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right." *Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989); *see also Henry v. County of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997) ("[W]e reiterate our rule that post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry.")

[18]We incorporate here and in all following paragraphs those portions of the New York City Commission to Combat Police Corruption Annual Reports, from 1996 to 2019, discuss the NYPD's failure to properly charge and terminate officers for making false statements.

308.    The problem of officers making false statements documented by these reports has been permitted, during the ensuing years, to continue to fester, as the New York Times recently documented.[19]

309.    The Times reported that there were "more than 25 occasions since January 2015" in which "judges or prosecutors determined that a key aspect of a New York City police officer's testimony was probably untrue."  The article noted that these cases represented "almost certainly only a fraction" of the actual instances of testilying, since "a vast majority of cases end in plea deals before an officer is ever required to take the witness stand."

310.    The article highlighted two cases where "officers appear to have given false accounts about witness identifications."

311.    A current 10-year veteran of the NYPD, when interviewed by the Times, stated: "'There's no fear of being caught . . . . You're not going to go to trial and nobody is going to be cross-examined.'"

312.    The Times reported that "[s]everal uniformed patrol officers said they have long suspected that the track record of plainclothes anti-crime teams for making weapons and drug arrests was bolstered by illegal searches and a tolerance for lying about them."

313.    In a follow-up article, the Times reported that, out of 81 cases in which the Civilian Complaint Review Board ("CCRB") had found that an NYPD officer had made a false

---

[19]*See* Joseph Goldstein, 'Testilying' by Police: A Stubborn Problem, N.Y. Times, Mar. 18, 2018, https://www.nytimes.com/2018/03/18/nyregion/testilying-police-perjury-new-york.html

statement and the NYPD had reported some response to the finding, NYPD policymaking officials had disciplined officers in only two of the cases.[20]

314.    The CCRB told the reporter that, in addition to these 81 cases, the CCRB had made findings of false statements in "dozens of other" cases, but the NYPD never even responded to these findings.

315.    BuzzFeed reported that it had obtained NYPD files revealing that "from 2011 to 2015 at least 319 New York Police Department employees who committed offenses serious enough to merit firing were allowed to keep their jobs."[21]

316.    At least 50 of these instances of misconduct involved officers making misleading or "inaccurate" statements in official records or to grand juries, district attorneys, or internal affairs investigators.

317.    In every instance, NYPD policymaking officials who had "final authority in disciplinary decisions, assigned these officers to 'dismissal probation,' a penalty with few practical consequences."

318.    Further, NYPD policymaking officials have withheld records of such misconduct from the City's District Attorneys' Offices.[22]

319.    Based on the above, NYPD policymaking officials knew or should have known, at the time of Viera's prosecution, that NYPD employees were manufacturing false evidence,

---

[20]*See* Joseph Goldstein, Promotions, Not Punishments, for Officers Accused of Lying, N.Y. Times, Mar. 19, 2018, https://www.nytimes.com/2018/03/19/nyregion/new-york-police-perjury -promotions.html.

[21] Kendall Taggart & Mike Hayes, Secret NYPD Files: Officers Who Lie And Brutally Beat People Can Keep Their Jobs, BuzzFeed, Mar. 5, 2018, https://www.buzzfeednews.com/article /kendalltaggart/secret-nypd-files-hundreds-of-officers-committed-serious.

[22]*See* James C. McKinley Jr., Manhattan District Attorney Demands Access to Police Records, N.Y. Times, July 8, 2018, https://www.nytimes.com/2018/07/08/nyregion/manhattan -district-attorney-police-records.html.

including false or unreliable lineup identifications, for the purpose of creating false grounds for establishing probable cause to arrest and prosecute suspects and to influence juries to return convictions.

320.     With deliberate indifference to such misconduct, NYPD policymaking officials failed to take adequate steps to train, supervise, or discipline NYPD employees to prevent or deter such constitutional violations from occurring.   To the contrary, NYPD policymaking officials protected those officers, ensured they were not fired, and failed to investigate and discipline such conduct.

321.     This policy of deliberate indifference directly, foreseeably, proximately, and substantially caused the violations of Viera's federal constitutional rights in this case and his resulting injuries, and the actions of the individual defendants in this case.

322.     By virtue of the foregoing, Defendant City of New York is liable for Plaintiff's wrongful prosecution and conviction and all resultant damages (¶ 135).

### SIXTH CAUSE OF ACTION
(42 U.S.C. §1983 Civil Conspiracy, Concerted Action,
Aiding and Abetting; McDonald, Obdyke, and Vargas)

323.     Viera repeats and realleges each and every allegation contained in ¶¶ 1-323 of this Complaint, and incorporates them here and in all following paragraphs.

324.     McDonald, Obdyke, and Vargas all explicitly and/or implicitly corruptly agreed to commit with each other, Williams and Ms. Williams, and/or other unnamed conspirators, the wrongs detailed above, and to ultimately have Viera falsely arrested, prosecuted, convicted, and to cover-up each others' misconduct.

325.     McDonald, Obdyke, and Vargas committed the overt acts, *as detailed above* (¶¶ 1-285) to accomplish the goal of the conspiracy, including, but not limited to (a) framing and falsely arresting and prosecuting Viera for attempting to murder Williams, and (b) covering-up those actions and the *Brady/Giglio* material that undermined the case against Viera.

326.     By virtue of the foregoing, defendants conspired to deprive Viera of his constitutional rights to:

(a)     Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based upon false, fabricated, manufactured, misleading, or inherently unreliable "evidence," including the statements and testimony of witnesses who have been improperly influenced, coerced, or manipulated to provide such statements and testimony, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, *Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000) (recognizing the "right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity");

(b)     Not to be deprived of his liberty absent probable cause to believe he has committed a crime, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

(c)     To timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

327.     McDonald, Obdyke, and Vargas committed the foregoing violations of Viera's constitutional rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to them, or to the effect of such misconduct upon them.

328.     By reason of the foregoing, those defendants are liable to Viera pursuant to 42

U.S.C. § 1983, for compensatory and punitive damages detailed in ¶ 135, above.

### SEVENTH CAUSE OF ACTION
(Malicious Prosecution Under New York Law; All Defendants)

329.     Viera realleges each and every allegation contained in ¶¶ 1-328 of this Complaint,

and incorporates them here and in all following paragraphs.

330.     By virtue of the foregoing, McDonald, Obdyke, and Vargas, acting in concert with

each other and with additional persons for whose acts they are liable, initiated, continued, and/or

caused the initiation or continuation of, criminal proceedings against Viera.

331.     The criminal proceedings terminated in Viera's favor.

332.     There was no probable cause for the commencement or the continuation of the

criminal proceedings.

333.     The Defendants acted with actual malice.

334.     The City is liable for these wrongs under the principle of *respondeat superior* for

the damages set forth in ¶ 135, above.

## EIGHTH CAUSE OF ACTION

(New York State Constitutional Due Process Claim Against The City
Pursuant To *Respondent Superior*; *Buari v. City of New York*, 2021
WL 1198371 (S.D.N.Y.  2021); *Bolt v. City of New York*, 21 CV 2218
(Report & Recommendation, Sept 15, 2023) (Kuo, M.J.); *Johnson v. City of New York*, 21 CV 2220 (Sept. 15, 2023) (Kuo, M.J.) (Report & Recommendation, Sept
15, 2023)

335.    Viera realleges the allegations in the paragraphs ¶¶ 1-334 of this Complaint, and incorporates them here and in all following paragraphs.

336.    McDonald, Obdyke, and Vargas by virtue of their acts and omissions detailed above, violated Viera's rights under the Due Process and Equal Protection provisions of the New York State Constitution (a) to be free of unlawful arrest not based on probable cause, (b) to not have a government officer acting in an investigating capacity fabricate evidence against him, (c) to due process of law, (d) to a fair trial, and (e) to not be convicted based on false or misleading evidence and argument, and suppression of *Brady* material.

337.    As a direct and proximate result of these defendants' acts and omissions, Viera was wrongfully arrested, prosecuted, convicted, and imprisoned for nearly 11 years, and suffered other grievous and continuing injuries set forth in ¶ 135, above.

338.    The City is liable under *respondeat superior* for the acts and omissions of McDonald, Obdyke, and Vargas, within the scope of their employment, for Viera's damages.

WHEREFORE, Viera demands judgment against defendants as follows:

a.      For compensatory damages of not less than $50,000,000;

b.      For punitive damages against the individual defendants of $25,000,000;

c.      For reasonable attorneys' fees, together with costs;

      d.     For pre-judgment interest as allowed by law; and

      e.     For such other and further relief as this Court may deem just and proper.

DATED:     March 1, 2024
            New York, New York

*Andrew M. Stengel*

_____
ANDREW M. STENGEL, ESQ.
The Law Firm of Andrew M. Stengel, P.C.
11 Broadway Suite 715
New York, New York 10004
Tel: 212-634-9222
Fax: 212-634-9223
Email: andrew@stengellaw.com

*Attorneys for Shamar Viera*